CUYLER, CORRECTIONAL SUPERINTENDENT, ET AL.
v. ADAMS

No. 78–1841.   Argued October 7, 1980—Decided January 21, 1981

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and STEWART, J., joined, *post*, p. 450.

*Maria Parisi Vickers,* Deputy Attorney General of Pennsylvania, argued the cause for petitioners. With her on the

brief were *Edward G. Biester, Jr.,* Attorney General, and *John O. J. Shellenberger,* Deputy Attorney General.

*James D. Crawford* argued the cause and filed a brief for respondent.*

JUSTICE BRENNAN delivered the opinion of the Court.

This case requires us to decide a recurring question concerning the relationship between the Interstate Agreement on Detainers and the Uniform Criminal Extradition Act.[1] The specific issue presented is whether a prisoner incarcerated in a jurisdiction that has adopted the Extradition Act is entitled to the procedural protections of that Act—particularly the right to a pretransfer hearing—before being transferred to another jurisdiction pursuant to Art. IV of the Detainer Agreement. The Court of Appeals for the Third Circuit held as a matter of statutory construction that a prisoner is entitled to such protections. 592 F. 2d 720 (1979). The Courts

---

*Solicitor General McCree, Assistant Attorney General Heymann, William G. Otis, and Elliott Schulder filed a brief for the United States as amicus curiae.*

[1] The Interstate Agreement on Detainers, codified in Pennsylvania at 42 Pa. Cons. Stat. § 9101 *et seq.* (Supp. 1980), is a compact among 48 States, the District of Columbia, and the United States. Initially drafted by the Council of State Governments in 1956 and included in the Council's Suggested State Legislation Program for 1957, the Agreement establishes procedures by which one jurisdiction may obtain temporary custody of a prisoner incarcerated in another jurisdiction for the purpose of bringing that prisoner to trial. Unlike the Extradition Act, the Detainer Agreement establishes procedures under which a prisoner may initiate his transfer to the receiving State and procedures that ensure protection of the prisoner's speedy trial rights.

The Uniform Criminal Extradition Act, codified in Pennsylvania at 42 Pa. Cons. Stat. § 9121 *et seq.* (Supp. 1980), has been adopted by 48 States, Puerto Rico, and the Virgin Islands. Initially drafted in 1926 and revised 10 years later, the Extradition Act, like the Detainer Agreement, establishes procedures for the interstate transfer of persons against whom criminal charges are outstanding. Unlike the Detainer Agreement, the Extradition Act applies to persons at liberty as well as to persons in prison.

of Appeals and state courts are divided upon the question,[2] and we granted certiorari to resolve the conflict.   444 U. S. 1069 (1980).

## I

In April 1976, respondent John Adams was convicted in Pennsylvania state court of robbery and was sentenced to 30 years in the State Correctional Institution at Graterford, Pa.   The Camden County (New Jersey) prosecutor's office subsequently lodged a detainer against respondent and in May 1977 filed a "Request for Temporary Custody" pursuant to Art. IV of the Detainer Agreement in order to bring him to Camden for trial on charges of armed robbery and other offenses.[3]

In an effort to prevent his transfer, respondent filed a *pro se* class-action complaint in June 1977 in the United States District Court for the Eastern District of Pennsylvania.   He sought declaratory, injunctive, and monetary relief under 42 U. S. C. §§ 1981 and 1983, alleging (1) that petitioners had violated the Due Process and Equal Protection Clauses by failing to grant him the pretransfer hearing that would have

---

[2] Compare *Atkinson* v. *Hanberry,* 589 F. 2d 917 (CA5 1979); *Commonwealth ex rel. Coleman* v. *Cuyler,* 261 Pa. Super. 274, 396 A. 2d 394 (1978); *State* v. *Thompson,* 133 N. J. Super. 180, 336 A. 2d 11 (1975); *Hystad* v. *Rhay,* 12 Wash. App. 872, 533 P. 2d 409 (1975); and *Wertheimer* v. *State,* 294 Minn. 293, 201 N. W. 2d 383 (1972); with 592 F. 2d 720 (CA3 1979) (case below); *McQueen* v. *Wyrick,* 543 S. W. 2d 778 (Mo. 1976); *Moen* v. *Wilson,* 189 Colo. 85, 536 P. 2d 1129 (1975); and *State ex rel. Garner* v. *Gray,* 55 Wis. 2d 574, 201 N. W. 2d 163 (1972).

[3] While the term "detainer" is nowhere defined in the Detainer Agreement, we noted in *United States* v. *Mauro,* 436 U. S. 340 (1978), that the House and Senate Reports accompanying Congress' adoption of the Detainer Agreement had defined a detainer as " 'a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction.' " *Id.,* at 359, quoting H. R. Rep. No. 91–1018, p. 2 (1970); S. Rep. No. 91–1356, p. 2 (1970).

been available had he been transferred pursuant to the Extradition Act; and (2) that petitioners had violated the Due Process Clause by failing to inform him of his right pursuant to Art. IV (a) of the Detainer Agreement to petition Pennsylvania's Governor to disapprove New Jersey's request for custody. Respondent contended, *inter alia*, that had he been granted a hearing or advised of his right to petition the Governor, he would have been able to convince Pennsylvania authorities to deny the custody request.[4]

The District Court, without reaching the class certification issue, dismissed respondent's complaint in October 1977 for failure to state a claim upon which relief could be granted. 441 F. Supp. 556. Respondent was then transferred to New Jersey,[5] where he was convicted, sentenced to a 9½-year prison term (to be served concurrently with his Pennsylvania sentence), and returned to Pennsylvania.

The Court of Appeals for the Third Circuit vacated the District Court judgment and remanded for further proceedings. 592 F. 2d 720 (1979). Finding no need to reach respondent's constitutional claims, see *Hagans* v. *Lavine*, 415 U. S. 528, 543 (1974), it concluded as a matter of statutory construction that respondent had a right under Art. IV (d) of the Detainer Agreement to the procedural safeguards, including a pretransfer "hearing," prescribed by § 10 of the Extradition Act. It made no finding with respect to respond-

---

[4] Apparently, Adams intended to argue that the State of New Jersey had acted in bad faith by deliberately not filing its custody request until after his chief alibi witness had died. While Adams presumably could have raised that argument in his petition to the Governor, he could not have raised it in either a pretransfer "hearing" under the Extradition Act or in a subsequent habeas proceeding. See n. 11, *infra*.

[5] Although the District Court stated in its October 1977 opinion that Adams had already been transferred to New Jersey, petitioners have informed this Court that the transfer did not actually occur until January 1978, three months after the District Court opinion. See Brief for Petitioners 31, n. 4.

ent's argument that he was entitled to notification of his right to petition the Governor.[6]

## II

While this case was on appeal, a Pennsylvania state court held that state prisoners transferred under Art. IV of the Detainer Agreement have no constitutional right to a pre-transfer hearing. *Commonwealth ex rel. Coleman* v. *Cuyler*, 261 Pa. Super. 274, 396 A. 2d 394 (1978). Although the Court of Appeals did not reach this constitutional issue, it held that it was not bound by the state court's result because the Detainer Agreement is an interstate compact approved by Congress and is thus a federal law subject to federal rather than state construction. Before reaching the merits of the Third Circuit's decision, we must determine whether that conclusion was correct. We hold that it was.

The Compact Clause of the United States Constitution, Art. I, § 10, cl. 3, provides that "No State shall, without the Consent of the Congress, . . . enter into any Agreement or Compact with another State . . . ." Because congressional consent transforms an interstate compact within this Clause into a law of the United States, we have held that the construction of an interstate agreement sanctioned by Congress under the Compact Clause presents a federal question. See *Petty* v. *Tennessee-Missouri Bridge Comm'n*, 359 U. S. 275, 278 (1959); *West Virginia ex rel. Dyer* v. *Sims*, 341 U. S. 22, 28 (1951); *Delaware River Joint Toll Bridge Comm'n* v. *Colburn*, 310 U. S. 419, 427 (1940).[7] It thus remains to be

---

[6] Accordingly, we do not reach this issue.

[7] The "law of the Union" doctrine upon which this principle is based had its origin in *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 13 How. 518 (1852). In that case, a bridge construction company defended a nuisance suit on the ground that the state legislature had authorized construction of the offending bridge. The company argued that the state legislative authorization shielded it from the nuisance suit because "there is no act of Congress prohibiting obstructions on the Ohio

determined whether the Detainer Agreement is a congressionally sanctioned interstate compact within Art I, § 10, of the Constitution.

The requirement of congressional consent is at the heart of the Compact Clause. By vesting in Congress the power to grant or withhold consent, or to condition consent on the

River, and . . . until there shall be such a regulation, a State, in the construction of bridges, has a right to exercise its own discretion on the subject." This Court rejected that argument in light of a clause in the Virginia-Kentucky Compact of 1789, sanctioned by Congress, declaring that the use and navigation of the Ohio River shall be "free and common to the citizens of the United States." *Id.,* at 565. Even though there had been no Act of Congress explicitly regulating navigation on the river, the Court stated that the prohibition in the Compact was controlling because "[t]his compact, by the sanction of Congress, has become a law of the Union. What further legislation can be desired for judicial action?" *Id.,* at 566; see also *Wedding* v. *Meyler,* 192 U. S. 573, 581–582 (1904).

Although the law-of-the-Union doctrine was questioned in *People* v. *Central R. Co.,* 12 Wall. 455, 456 (1872) and in *Hinderlider* v. *La Plata River & Cherry Creek Ditch Co.,* 304 U. S. 92, 109 (1938), any doubts as to its continued vitality were put to rest in *Delaware River Joint Toll Bridge Comm'n* v. *Colburn,* 310 U. S., at 427–428, where the Court stated:

"In *People* v. *Central Railroad,* . . . jurisdiction of this Court to review a judgment of a state court construing a compact between states was denied on the ground that the Compact was not a statute of the United States and that the construction of the Act of Congress giving consent was in no way drawn in question, nor was any right set up under it. This decision has long been doubted, . . . and we now conclude that the construction of such a compact sanctioned by Congress by virtue of Article I, § 10, Clause 3 of the Constitution, involves a federal 'title, right, privilege or immunity' which when 'specially set up and claimed' in a state court may be reviewed here on certiorari under § 237 (b) of the Judicial Code, 28 U. S. C. § 344." *Id.,* at 427.

This holding reaffirmed the law-of-the-Union doctrine and the underlying principle that congressional consent can transform interstate compacts into federal law. Accord, *Petty* v. *Tennessee-Missouri Bridge Comm'n,* 359 U. S., at 278; see also *United States ex rel. Esola* v. *Groomes,* 520 F. 2d 830, 841 (CA3 1975) (Garth, J., concurring); *League to Save Lake Tahoe* v. *Tahoe Regional Planning Agency,* 507 F. 2d 517 (CA9 1974), cert. denied, 420 U. S. 974 (1975).

States' compliance with specified conditions, the Framers sought to ensure that Congress would maintain ultimate supervisory power over cooperative state action that might otherwise interfere with the full and free exercise of federal authority. See Frankfurter & Landis, The Compact Clause of the Constitution—A Study in Interstate Adjustments, 34 Yale L. J. 685, 694-695 (1925).

Congressional consent is not required for interstate agreements that fall outside the scope of the Compact Clause. Where an agreement is not "directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States," it does not fall within the scope of the Clause and will not be invalidated for lack of congressional consent. See, e. g., *United States Steel Corp.* v. *Multistate Tax Comm'n*, 434 U. S. 452, 468 (1978), quoting *Virginia* v. *Tennessee*, 148 U. S. 503, 519 (1893); *New Hampshire* v. *Maine*, 426 U. S. 363, 369-370 (1976). But where Congress has authorized the States to enter into a cooperative agreement, and where the subject matter of that agreement is an appropriate subject for congressional legislation, the consent of Congress transforms the States' agreement into federal law under the Compact Clause.[8]

---

[8] See *West Virginia ex rel. Dyer* v. *Sims,* 341 U. S. 22, 26 (1951) (congressional consent given to compact to control pollution in interstate streams, "an appropriate subject for national legislation"); *Petty* v. *Tennessee-Missouri Bridge Comm'n, supra,* at 281 (congressional consent given to compact affecting navigable waters and interstate commerce).

As JUSTICE WHITE stated, dissenting in *United States Steel Corp.* v. *Multistate Tax Comm'n,* 434 U. S. 452 (1978):

"Congress does not pass upon a submitted compact in the manner of a court of law deciding a question of constitutionality. Rather, the requirement that Congress approve a compact is to obtain its political judgment: Is the agreement likely to interfere with federal activity in the area, is it likely to disadvantage other States to an important extent, is it a matter that would better be left untouched by state and federal regulation?" *Id.,* at 485 (footnotes omitted).

Congress may consent to an interstate compact by authorizing joint state action in advance or by giving expressed or implied approval to an agreement the States have already joined. *Virginia* v. *Tennessee, supra,* at 521; *Green* v. *Biddle,* 8 Wheat. 1, 85–87 (1823). In the case of the Detainer Agreement, Congress gave its consent in advance by enacting the Crime Control Consent Act of 1934, 48 Stat. 909, as amended.[9] In pertinent part, this Act provides:

> "The consent of Congress is hereby given to any two or more States to enter into agreements or compacts for cooperative effort and mutual assistance in the prevention of crime and in the enforcement of their respective criminal laws and policies . . . ." 4 U. S. C. § 112 (a).

---

[9] Congress enacted the Crime Control Consent Act for the express purpose of complying with the "congressional consent" requirement of the Compact Clause. As stated in both the House and Senate Reports accompanying the Act:

"Legislation is necessary to accomplish the purpose sought by the bill because of the language of that part of article I, section 10, of the Constitution which provides:

" 'No State shall, without the consent of Congress . . . enter into an agreement or compact with another State . . . .'

.          .          .          .          .

"This bill seeks to remove the obstruction imposed by the Federal Constitution and allow the States cooperatively and by mutual agreement to work out their problems of law enforcement." S. Rep. No. 1007, 73d Cong., 2d Sess., 1 (1934); H. R. Rep. No. 1137, 73d Cong., 2d Sess., 1–2 (1934).

There can be no doubt that the Detainer Agreement falls within the scope of this congressional authorization. Not only do the drafters of the Agreement state in their interpretive handbook that it "falls within the purview" of the 1934 Act and therefore has the consent of Congress, see Council of State Governments, The Handbook of Interstate Crime Control 117 (1978), but also Congress itself, when adopting the Detainer Agreement on behalf of the District of Columbia and the United States, Pub. L. 91–538, 84 Stat. 1397, expressly stated that it had authorized the Detainer Agreement in the Crime Control Consent Act. See H. R. Rep. No. 91–1018 (1970); S. Rep. No. 91–1356 (1970). At the same time, Congress implicitly reaffirmed its consent to the Agreement.

Because this Act was intended to be a grant of consent under the Compact Clause, and because the subject matter of the Act is an appropriate subject for congressional legislation,[10] we conclude that the Detainer Agreement is a congressionally sanctioned interstate compact the interpretation of which presents a question of federal law. We therefore turn to the merits of the Court of Appeals' holding that as a matter of statutory construction Art. IV (d) of the Detainer Agreement is to be read as incorporating the procedural safeguards provided by § 10 of the Extradition Act.

---

[10] Congressional power to legislate in this area is derived from both the Commerce Clause and the Extradition Clause. The latter Clause, Art. IV, § 2, cl. 2, has provided Congress with power to legislate in the extradition area since 1793 when it passed the first Federal Extradition Act, 1 Stat. 302, now codified at 18 U. S. C. § 3182. See *Michigan* v. *Doran*, 439 U. S. 282, 286–287 (1978); *Innes* v. *Tobin*, 240 U. S. 127, 130–131, 134–135 (1916); *Roberts* v. *Reilly*, 116 U. S. 80, 94 (1885); *Robb* v. *Connolly*, 111 U. S. 624, 628 (1884); *Kentucky* v. *Dennison*, 24 How. 66, 104–105 (1861); *DeGenna* v. *Grasso*, 413 F. Supp. 427, 431 (Conn.), aff'd *sub nom. Carino* v. *Grasso*, 426 U. S. 913 (1976).

Congress' recognition that it had power to legislate in this area is also evidenced by the House and Senate Reports accompanying the 1934 Act,

"The rapidity with which persons may move from one State to another, those charged with crime and those who are necessary witnesses in criminal proceedings, and the fact that there are no barriers between the States obstructing this movement, makes it *necessary that one of two things shall be done, either that the criminal jurisdiction of the Federal Government shall be greatly extended or that the States by mutual agreement shall aid each other in the detection and punishment of offenders against their respective criminal laws."* S. Rep. No. 1007, *supra*, at 1 (emphasis added); H. R. Rep. No. 1137, *supra*, at 1 (emphasis added).

Despite the contrary suggestion made by the dissent, *post*, at 453–454, we do not decide today whether the cited examples of "reciprocal legislation in the criminal area" have received congressional consent or whether the subject matter of any of the cited Acts is an appropriate subject for congressional legislation. Those determinations must await cases properly raising the Compact Clause question with respect to those Acts.

## III

The Detainer Agreement and the Extradition Act both establish procedures for the transfer of a prisoner in one jurisdiction to the temporary custody of another jurisdiction. A prisoner transferred under the Extradition Act is explicitly granted a right to a pretransfer "hearing" at which he is informed of the receiving State's request for custody, his right to counsel, and his right to apply for a writ of habeas corpus challenging the custody request. He is also permitted "a reasonable time" in which to apply for the writ.[11] However, no similar explicit provision is to be found in the Detainer Agreement.

The Detainer Agreement establishes two procedures under which the prisoner against whom a detainer has been lodged may be transferred to the temporary custody of the receiving State. One of these procedures may be invoked by the

[11] Section 10 of the Uniform Criminal Extradition Act, codified in Pennsylvania at 42 Pa. Cons. Stat. § 9131 (Supp. 1980), provides;

"No person arrested upon such warrant shall be delivered over to the agent whom the executive authority demanding him shall have appointed to receive him unless he shall first be taken forthwith before a judge of a court of record in this Commonwealth who shall inform him of the demand made for his surrender and of the crime with which he is charged and that he has the right to demand and procure legal counsel, and, if the prisoner or his counsel shall state that he or they desire to test the legality of his arrest, the judge of such court of record shall fix a reasonable time to be allowed him within which to apply for a writ of habeas corpus."

The person being extradited has no right to challenge the facts surrounding the underlying crime or the lodging of the custody request at the first hearing. Even at the later habeas corpus hearing, if any, he is permitted to question only

"(a) whether the extradition documents on their face are in order; (b) whether [he] has been charged with a crime in the demanding state; (c) whether [he] is the person named in the request for extradition; and (d) whether [he] is a fugitive." *Michigan* v. *Doran, supra,* at 289.

prisoner; the other by the prosecuting attorney of the receiving State.

Article III of the Agreement provides the prisoner-initiated procedure. It requires the warden to notify the prisoner of all outstanding detainers and then to inform him of his right to request final disposition of the criminal charges underlying those detainers. If the prisoner initiates the transfer by demanding disposition (which under the Agreement automatically extends to *all* pending charges in the receiving State), the authorities in the receiving State must bring him to trial within 180 days or the charges will be dismissed with prejudice, absent good cause shown.

Article IV of the Agreement provides the procedure by which the prosecutor in the receiving State may initiate the transfer. First, the prosecutor must file with the authorities in the sending State written notice of the custody request, approved by a court having jurisdiction to hear the underlying charges. For the next 30 days, the prisoner and prosecutor must wait while the Governor of the sending State, on his own motion or that of the prisoner, decides whether to disapprove the request.[12] If the Governor does not disapprove, the prisoner is transferred to the temporary custody of the receiving State where he must be brought to trial on the charges underlying the detainer within 120 days of his arrival. Again, if the prisoner is not brought to trial within the time period, the charges will be dismissed with prejudice, absent good cause shown.

Although nothing in the Detainer Agreement explicitly provides for a pretransfer hearing, respondent contends that prisoners who are involuntarily transferred under Art. IV are

---

[12] Article IV (a) provides in pertinent part:

"[T]here shall be a period of 30 days after receipt by the appropriate authorities before the request be honored, within which period the Governor of the sending state may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner."

entitled to greater procedural protections than those who initiate the transfer procedure under Art. III. He argues that a prisoner who initiates his own transfer to the receiving State receives a significant benefit under the Agreement and may thus be required to waive any right he might have to contest his transfer; but that a prisoner transferred against his will to the receiving State under Art. IV does not benefit from the Agreement and is thus entitled to assert any right he might have had under the Extradition Act (or any other state law applicable to interstate transfer of prisoners) to challenge his transfer.

Respondent's argument has substantial support in the language of the Detainer Agreement. Article III (e) provides that "[a]ny request for final disposition made by a prisoner [under this Article] *shall also be deemed to be a waiver of extradition* with respect to any charge or proceeding contemplated thereby . . . ." (Emphasis added.) The reference to "waiver of extradition" can reasonably be interpreted to mean "waiver of those rights the sending state affords persons being extradited." Since Pennsylvania has adopted the Uniform Criminal Extradition Act, those rights would include the rights provided by § 10 of that Act.

The language of Art. IV supports respondent's further contention that a prisoner's extradition rights are meant to be preserved when the receiving State seeks disposition of an outstanding detainer. Article IV (d) provides:

> "Nothing contained in this Article shall be construed to deprive any prisoner of any right which he may have to contest the legality of his delivery as provided in paragraph (a) hereof, but such delivery may not be opposed or denied on the ground that the executive authority of the sending state has not affirmatively consented to or ordered such delivery."

Petitioners argue that the phrase "as provided in paragraph (a) hereof" modifies "right," not "delivery," and that para-

graph (d) does no more than protect the right paragraph (a) gives the prisoner to petition the Governor to disapprove the custody request.[13]  The Court of Appeals rejected this interpretation, concluding that the phrase "as provided in paragraph (a) hereof" modifies "delivery," not "right." Since the major thrust of paragraph (a) is to describe the means by which the receiving State may obtain temporary custody of the prisoner, the Court of Appeals held that paragraph (d) must have been intended as the vehicle for incorporating all rights a prisoner would have under state or other laws to contest his transfer, except that the prisoner must forfeit his right, otherwise available under § 7 of the Extradition Act,[14] to oppose such transfer on the ground that the Governor had not explicitly approved the custody request.

There are three textual reasons why we find this interpretation convincing.  First, if paragraph (d) protects only the right provided by paragraph (a) to petition the Governor, as petitioners claim, it is difficult to understand what purpose paragraph (d) serves in the Agreement.  Why would the drafters add a second provision to protect a right already explicitly provided?  Common sense requires paragraph (d) to be construed as securing something more.

Second, the one ground for contesting a transfer that paragraph (d) explicitly withholds from the prisoner—that the transfer has not been affirmatively approved by the Gover-

---

[13] Paragraph (a) performs two functions.  First, it provides the means by which the receiving State may request the custody of a prisoner incarcerated in the sending State.  Second, it authorizes the Governor of the sending State to disapprove that custody request either on his own motion or on that of the prisoner.

[14] Section 7 of the Uniform Criminal Extradition Act, codified in Pennsylvania at 42 Pa. Cons. Stat. § 9128 (Supp. 1980), provides:

"If the Governor decides that the demand should be complied with he shall sign a warrant of arrest which shall be sealed with the State seal and be directed to any peace officer or other person whom he may think fit to entrust with the execution thereof.  The warrant must substantially recite the facts necessary to the validity of its issuance."

nor—is a ground that the Extradition Act expressly reserves to the prisoner. It is surely reasonable to conclude from the elimination of this ground in the Detainer Agreement that the drafters meant the Detainer Agreement to be read as not affecting any rights given prisoners by the Extradition Act that are not expressly withheld by the Detainer Agreement. As the Court of Appeals concluded, "the fact that Article IV (d) does specifically refer to one minor procedural feature of the extradition process which is to be affected suggests forcefully that the other aspects, particularly those furnishing safeguards to the prisoner, are to continue in effect." 592 F. 2d, at 724.

Finally, paragraph (d) refers to *"any* right [the prisoner] may have" (emphasis added) to challenge the legality of his transfer. This suggests that more than one right is involved, a suggestion that is consistent with respondent's contention that *all* pre-existing rights are preserved. If petitioners' contention were correct—that the only right preserved is the right provided in paragraph (a) to petition the Governor—it is much more likely that paragraph (d) would have referred narrowly to *"the* right the prisoner *does* have" to challenge the legality of his transfer.

The legislative history of the Detainer Agreement, contained in the comments on the draft Agreement made by the Council of State Governments at its 1956 conference and circulated to all the adopting States, further supports the Court of Appeals' reading. In discussing the different degrees of protection to which a prisoner is entitled under Arts. III and IV of the Agreement, the drafters stated:

> *"Article IV (d) safeguards certain of the prisoner's rights.* Normally, the only way to get a prisoner from one jurisdiction to another for purposes of trial on an indictment, information or complaint is through resort to extradition or waiver thereof. If the prisoner waives, there is no problem. However, *if he does not waive extradition, it*

*is not appropriate to attempt to force him to give up the safeguards of the extradition process,* even if this could be done constitutionally." Council of State Governments, Suggested State Legislation, Program for 1957, pp. 78–79 (1956) (emphasis added).

The suggestion, of course, is that a prisoner transferred against his will under Art. IV should be entitled to whatever "safeguards of the extradition process" he might otherwise have enjoyed. Those safeguards include the procedural protections of the Extradition Act (in those States that have adopted it), as well as any other procedural protections the sending State guarantees persons being extradited from within its borders.

That this is what the drafters intended is further suggested by the distinction they make between Art. III and Art. IV procedures:

"The situation contemplated by this portion of the agreement [Article IV] is different than that dealt with in Article III. [Article III] relates to proceedings initiated at the request of the prisoner. Accordingly, in such instances it is fitting that the prisoner be required to waive extradition. In Article IV the prosecutor initiates the proceeding. Consequently, it probably would be improper to require the prisoner to waive those features of the extradition process which are designed for the protection of his rights." *Id.,* at 79.

These statements strongly support respondent's contention that prisoners were meant to be treated differently depending on which Article was being invoked, and that the general body of procedural rights available in the extradition context was meant to be preserved when the transfer was effected pursuant to Art. IV.

Article IX of the Detainer Agreement states that the Agreement "shall be liberally construed so as to effectuate its purpose." The legislative history of the Agreement, including

the comments of the Council of State Governments and the congressional Reports and debates preceding the adoption of the Agreement on behalf of the District of Columbia and the Federal Government, emphasizes that a primary purpose of the Agreement is to protect prisoners against whom detainers are outstanding. As stated in the House and Senate Reports:

> "[A] prisoner who has had a detainer lodged against him is seriously disadvantaged by such action. He is in custody and therefore in no position to seek witnesses or to preserve his defense. He must often be kept in close custody and is ineligible for desirable work assignments. What is more, when detainers are filed against a prisoner he sometimes loses interest in institutional opportunities because he must serve his sentence without knowing what additional sentences may lie before him, or when, if ever, he will be in a position to employ the education and skills he may be developing." H. R. Rep. No. 91–1018, p. 3 (1970); S. Rep. No. 91–1356, p. 3 (1970).

The remedial purpose of the Agreement supports an interpretation that gives prisoners the right to a judicial hearing in which they can bring a limited challenge to the receiving State's custody request.[15] In light of the purpose of the Detainer Agreement, as reflected in the structure of the Agree-

---

[15] Petitioners contend that our interpretation frustrates one of the major purposes of the Detainer Agreement, which is to streamline the extradition process. We cannot accept that argument. The Detainer Agreement already provides a 30-day period from the date the prosecutor makes a request for custody until the date the prisoner can be transferred. Even if the hearing required by the Extradition Act could not be held until after the expiration of that 30-day period, which we do not now decide, there is no reason the prisoner could not be brought before a court on the 31st day. Moreover, the "reasonable time" a judge fixes for a prisoner to file for a writ of habeas corpus under the Extradition Act might also be computed in recognition of the 30-day period established by the Detainer Agreement.

ment, its language, and its legislative history, we conclude as a matter of federal law that prisoners transferred pursuant to the provisions of the Agreement are not required to forfeit any pre-existing rights they may have under state or federal law to challenge their transfer to the receiving State. Respondent Adams has therefore stated a claim for relief under 42 U. S. C. § 1983 for the asserted violation by state officials of the terms of the Detainer Agreement. See *Maine* v. *Thiboutot,* 448 U. S. 1 (1980).

*Affirmed.*

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and JUSTICE STEWART join, dissenting.

In a remarkable feat of judicial alchemy the Court today transforms state law into federal law. It decides that the construction of an enactment of the Pennsylvania Legislature, for which the consent of Congress was not required under the Constitution, and to which Congress never consented at all save in the vaguest terms some 25 years prior to its passage, presents a federal question. *Ante,* Part II. Nothing in the prior decisions of this Court suggests, say nothing of compels, such an untoward result.

The cases relied upon by the Court establish, at most, that the interpretation of an interstate compact sanctioned by Congress *pursuant to the Compact Clause* will present a federal question. See *Petty* v. *Tennessee-Missouri Bridge Comm'n,* 359 U. S. 275, 278 (1959) ("The construction of a compact sanctioned by Congress *under Art. I, § 10, cl. 3, of the Constitution* presents a federal question") (emphasis supplied); *West Virginia ex rel. Dyer* v. *Sims,* 341 U. S. 22, 27 (1951) ("congressional consent [was] required"); *Delaware River Joint Toll Bridge Comm'n* v. *Colburn,* 310 U. S. 419, 427 (1940) ("the construction of . . . a compact sanctioned by Congress *by virtue of Article I, § 10, Clause 3 of the Constitution,* involves a federal 'title, right, privilege or immu-

nity' ") (emphasis supplied). In light of our recent decisions, however, it cannot seriously be contended that the Detainer Agreement constitutes an "agreement or compact" as those terms have come to be understood in the Compact Clause. In *New Hampshire* v. *Maine,* 426 U. S. 363 (1976), we held that the "application of the Compact Clause is limited to agreements that are 'directed to the formation of any combination tending to the increase of the political power in the States, which may encroach upon or interfere with the just supremacy of the United States.' " *Id.,* at 369, quoting *Virginia* v. *Tennessee,* 148 U. S. 503, 519 (1893). This rule was reaffirmed in *United States Steel Corp.* v. *Multistate Tax Comm'n,* 434 U. S. 452, 471 (1978), where the Court ruled that the quoted test "states the proper balance between federal and state power with respect to compacts and agreements among States." Certainly nothing about the Detainer Agreement threatens the just supremacy of the United States or enhances state power to the detriment of federal sovereignty. As with the "compact" in *Multistate Tax Comm'n,* any State is free to join the Detainer Agreement, so it cannot be considered to elevate member States at the expense of nonmembers. See *id.,* at 477–478. Finally, despite contrary intimations by the Court, *ante,* at 441, n. 9, the views of the drafters of the Agreement or its form are not controlling. The agreement involved in *Multistate Tax Comm'n* was termed a "compact" and congressional consent to it was repeatedly sought, 434 U. S., at 456, 458, n. 8, yet the Court nonetheless held it was not a compact within the Compact Clause. See also *id.,* at 470–471 ("The mere form of the interstate agreement cannot be dispositive. . . . The relevant inquiry must be one of impact on our federal structure").

Since the Detainer Agreement is not an "agreement or compact" within the purview of the Compact Clause, that constitutional provision is irrelevant to this case, and the Court's reliance on it can only be described as baffling. Al-

though never maintaining that congressional consent was required by the Compact Clause for the Detainer Agreement—a conclusion foreclosed by our decisions—the Court nonetheless views its inquiry as "whether the Detainer Agreement is a congressionally sanctioned interstate compact *within Art. I, § 10, of the Constitution*" and concludes in this case that "the consent of Congress transforms the State's agreement into federal law *under the Compact Clause*." *Ante,* at 439, 440 (emphasis supplied). Whether a particular state enactment is "within" or "under" the Compact Clause, however, depends on whether it requires the consent of Congress—the Clause speaks of nothing else. Whatever effect the Compact Clause may have on those laws it *does* cover, one would have thought it unnecessary to say that it can have no effect on those it *does not* cover. See Engdahl, Construction of Interstate Compacts: A Questionable Federal Question, 51 Va. L. Rev. 987, 1017 (1965) ("[T]he construction of a compact not requiring consent, even if Congress has consented, will not present a federal question . . ."). The Court stresses the federal interest in the area of extradition, *ante,* at 442, n. 10, but, for Compact Clause purposes, "[a]bsent a threat of encroachment or interference through enhanced state power, the existence of a federal interest is irrelevant." *Multistate Tax Comm'n, supra,* at 480, n. 33.

If the Compact Clause of the Constitution does not operate to transform Pennsylvania's statute into federal law, it must be the consent of Congress, albeit unnecessary, which does so. Such a proposition is, however, contrary to the established rule in other contexts. The most fundamental example was discussed in *Coyle* v. *Smith,* 221 U. S. 559, 568 (1911):

> ". . . Congress may require, under penalty of denying admission, that the organic laws of a new State at the time of admission shall be such as to meet its approval. A constitution thus supervised by Congress would, after all, be a constitution of a State, and as such subject to

alteration and amendment by the State after admission. Its force would be that of a state constitution, and not that of an act of Congress."

The consent of Congress to state taxation of its instrumentalities does not mean that the interpretation of state tax laws presents a federal question, see *Gully* v. *First National Bank*, 299 U. S. 109, 115 (1936) ("That there *is* a federal law permitting such taxation does not change the basis of the suit, which is still the statute of the state, though the federal law is evidence to prove the statute valid") (emphasis in original), and when Congress consents to state laws regulating commerce which would otherwise be prohibited the state laws remain state laws, see *In re Rahrer,* 140 U. S. 545, 561 (1891) (by consent ". . . Congress has not attempted to delegate the power to regulate commerce, . . . or to adopt state laws"); *Prudential Insurance Co.* v. *Benjamin,* 328 U. S. 408, 438, n. 51 (1946) ("The . . . contention that Congress' 'adoption' of South Carolina's statute amounts to an unconstitutional delegation of Congress' legislative power to the states obviously confuses Congress' power to legislate with its power to consent to state legislation. They are not identical, though exercised in the same formal manner"). See generally Engdahl, *supra,* at 1015–1016. It is particularly unsettling that the Court would confuse an act of congressional consent with an act of legislation when the consent was completely gratuitous and given some 25 years before passage of the state law.

What is most disturbing about the Court's analysis is its potential sweep. The statute books of the States are full of reciprocal legislation in the criminal area. See, *e. g.,* Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, 11 U. L. A. 1 (Supp. 1980) (adopted in 54 jurisdictions); Uniform Rendition of Prisoners as Witnesses in Criminal Proceedings Act, 11 U. L. A. 547 (Supp. 1980) (adopted in 13 jurisdictions). As this Court made clear in *Multistate Tax Comm'n,* 434 U. S.,

at 469–471, such reciprocal legislation is as subject to the Compact Clause as other more formal interstate agreements. See *ibid.* (discussing *New York* v. *O'Neill,* 359 U. S. 1 (1959), a case involving the Uniform Act to Secure the Attendance of Witnesses); see also 434 U. S., at 491 (WHITE, J., dissenting). In light of the Court's analysis in this case, it is not at all clear why the construction of each of the provisions in this broad array of state legislation is not a federal matter. It is apparently no answer that congressional consent was not required under the Compact Clause; the same is true with the Detainer Agreement. And the congressional "consent" in the Crime Control Consent Act of 1934 applies with the same force to all this reciprocal legislation as it does to the Detainer Agreement. Yet it has never been supposed that the construction of the terms of such reciprocal legislation is a matter on which federal courts could override the courts of the enacting State. Enough has been said to demonstrate that the Court's opinion threatens to become a judicial Midas meandering through the state statute books, turning everything it touches into federal law.

Since I view the Detainer Agreement as a state statute, I would defer to the state court's interpretation of it. It is sufficiently clear to me that the court in *Commonwealth ex rel. Coleman* v. *Cuyler,* 261 Pa. Super. 274, 396 A. 2d 394 (1978), disagrees with the statutory interpretation undertaken by the Court of Appeals below and by this Court.*

---

*Judge Van der Voort, writing the opinion for the Pennsylvania court, assumed that the procedural protections sought by respondent were not incorporated as a matter of statutory interpretation in the Detainer Agreement, since he ruled that there was no constitutional deprivation in not affording those protections to prisoners subject to the Detainer Agreement. The state-court opinion contained a comprehensive survey of the features of both the Detainer Agreement and the Extradition Act, and did not read the Detainer Agreement to contain the protections which the federal court said were incorporated. Even Judge Spaeth, who dissented on the equal protection ground in the court decision, obviously considered

I would therefore reverse and remand, with instructions to the Court of Appeals to consider respondent's constitutional claims, which it avoided by what I consider unjustifiable statutory interpretation.

---

that the procedural protections under the two Acts were different, or else there could not have been an equal protection challenge. See also *Wallace* v. *Hewitt,* 428 F. Supp. 39 (MD Pa. 1976).