**Harold E. MALONE, Plaintiff,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, et al., Defendants.**

**COMMONWEALTH OF VIRGINIA, Plaintiff,**

v.

**AMALGAMATED TRANSIT UNION, LOCAL 689, et al., Defendants.**

**Civ. A. Nos. 85–0419–A, 85–0721–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Nov. 26, 1985.

⬅6

Lawrence E. Lindeman, Alexandria, Va., for Malone.

John S. Battle, Jr., McGuire, Woods, & Battle, William G. Broaddus, Atty. Gen., Richmond, Va., for Com. of Va.

Carol Sigmond, Sara E. Lister, Gen. Counsel, Washington, D.C., for Washington Metropolitan Area Transit Authority.

Jacob A. Kamerow, Kamerow & Kamerow, Alexandria, Va., for Local 689.

## MEMORANDUM OPINION

CACHERIS, District Judge.

This matter is before the court on Defendants' Washington Metropolitan Area Transit Authority ("WMATA") and Amalgamated Transit Union, Local 689 ("Local 689"), Motions for Summary Judgment. The parties agreed at the oral hearing on September 13, 1985, that the two cases were ripe for summary judgment. For the reasons set forth below, WMATA's and Local 689's Motions for Summary Judgment are granted.

### I

On August 16, 1983, WMATA and Local 689 entered into a collective bargaining agreement which included a union shop clause, denominated as Section 103(a). Section 103(a) of the agreement states:

> On and after the thirtieth day following the effective date of this contract, all of the employees of the Authority included in the bargaining unit ... shall become and remain members in good standing of the union as a condition precedent to continued employment....

Union Exhibit 1. Union shop clauses such as Section 103(a) are outlawed in Virginia under the Virginia Right to Work Act. Va. Code Ann. Section 40.1–58 *et seq.* (Repl.Vol. 1981). Virginia Code § 40.1–62 specifically provides:

> § 40.1–62. Employer not to require payment of union dues, etc.—No employer shall require any person, as a condition of employment or continuation of employment, to pay any dues, fees or other charges of any kind to any labor union or labor organization.

Va.Code Ann. § 40.1–62 (Repl.Vol.1981).

On or about March 15, 1985, Harold E. Malone, a railcar mechanic employed by WMATA at its facilities located in Alexandria, Virginia, filed an action in the Circuit Court for the City of Alexandria seeking a declaratory judgment holding that the provisions of the Virginia Right to Work Act, (Va.Code Ann.Section 40.1–58 *et seq.* apply to the collective bargaining agreement between WMATA and Local 689. Plaintiff Malone states in his Complaint that he

1424

wants to cease paying his union dues, but is fearful that if he does so his employment will be terminated. Therefore, Malone needs to know whether the provisions of Section 40.1–58 *et seq.* of the Code of Virginia apply to employees of WMATA who, like himself, live and work in Virginia. Obviously, if the Virginia law does apply, then Malone will not have to continue to pay union dues. On or about April 4, 1985, WMATA acted to remove the case to this Court and filed its answer.

On July 11, 1985, the Commonwealth of Virginia filed an action in the Circuit Court for Arlington County, seeking a declaratory judgment that the union shop clause, Section 103(a) of the WMATA–Local 689 agreement, violates the Virginia Right to Work Act. On or about June 24, 1985, WMATA acted to remove that action to this court and simultaneously filed its answer and moved to consolidate it with plaintiff Malone's action pursuant to Rule 42(a) of the Federal Rules of Civil Procedure. Thereafter, on June 28, 1985, WMATA moved to join Local 689 as a defendant in *Malone v. WMATA.* On July 3, 1985, this court consolidated the actions and directed that Local 689 be joined as a party defendant in *Malone v. WMATA.* These consolidated actions are now before the court on defendants WMATA and Local 689's Motions for Summary Judgment.

II

The basic facts are not in dispute.

WMATA was created by an interstate compact among the states of Maryland and Virginia and the District of Columbia with the consent of the Congress as a common agency and instrumentality of the signatories to plan, finance, develop, construct and operate a subway system in the Washington Metropolitan Area. P.L. 89–774; D.C.Code §§ 1–2431 and 2438. WMATA commenced functioning on September 30, 1967. (Remund Affidavit). In 1972, the signatories and Congress adopted the National Capital Transportation Act of 1972, Publ.L. No. 92–349, 86 Stat. 464, which

authorized WMATA to acquire and operate bus services previously provided by privately owned companies.[1]

The Authority is governed by a Board of Directors. There are six voting members, two representing each signatory and six alternates, two representing each signatory. P.L. 89–774(5) as amended by P.L. 92–349, codified at D.C.Code § 1–2431(5). Since September 30, 1967, Virginia, through its agency, the Northern Virginia Transportation Commission, has had representatives on the WMATA Board of Directors. Each signatory through its representatives has the power to veto any action of the WMATA Board of Directors. (Remund Affidavit).

Presently WMATA has approximately 5,700 employees in jobs covered by the WMATA Local 689 labor agreement. Approximately 750 of these employees report to work in Virginia. (Babic Affidavit).

WMATA employees represented by Local 689 select work sites under the "pick" provisions of the current labor agreement. Whether the employee receives that particular work site is dependant on seniority in relationship to other similarly classified employees. No employee is assured of working at his assigned work site. Employees may be moved, without their consent, to work locations throughout the system as the need requires.

WMATA has twenty eight reporting locations for employees represented by ATU Local No. 689. Of these only six (6) are located in Virginia. They are:

Arlington Bus Division
707 N. Randolph Street
Arlington, Virginia
Central Maintenance Facility
3101 Eisenhower Avenue
Alexandria, Virginia
Alexandria S & I Shop and Yard
3401 Eisenhower Avenue
Alexandria, Virginia
Four Mile Run Bus Division
3501 Glebe Road
Arlington, Virginia

1. The WMATA compact is codified at Va.Code §§ 56–529, 530. For legislation by Congress, *see* P.L. 86–794, 74 Stat. 1031; P.L. 87–767, 76 Stat. 764; P.L. 89–774, 80 Stat. 1324; P.L. 92–349, 86 Stat. 464.

Alexandria Bus Division
600 N. Royal Street
Alexandria, Virginia

System Maintenance Facility
195 Telegraph Road
Alexandria, Virginia

Additionally, some rail operation personnel report to National Airport before going to work locations located in either the District of Columbia or Maryland. (Babic Affidavit).

WMATA has complied with the Virginia Workmen's Compensation Act, Va.Code § 65.1-1 *et seq.* (1980 Repl.Volume), for those employees who had a primary work site in Virginia. (Transcript of September 13, 1985, p. 23).

Plaintiff Harold E. Malone has been employed by defendant Washington Metropolitan Area Transit Authority (WMATA) since September 29, 1982, as a railcar mechanic. His current assigned work location is in Alexandria, Virginia. He is subject to the pick and work assignment provisions described above. Mr. Malone resides in the Commonwealth of Virginia. (Babic Affidavit).

Defendants WMATA and Local 689 are parties to a collective bargaining agreement which provides in part:

> On and after the thirtieth day following the effective date of this contract, all of the employees of the Authority including the bargaining unit as defined in Section 102 hereof shall become and remain members in good standing of the Union as a condition precedent to continued employment, and the Union agrees to receive into the membership all such eligible employees according to the laws of the Union. This section shall become operative as to new employees thirty (30) days from the date of their appointment.

WMATA–Local 689 Agreement, Section 103(a). (Union Exhibit # 1). This agreement was approved by WMATA's Board of Directors and executed on September 16, 1983. It covers the period May 1, 1983, through April 30, 1986.[2]

In order for WMATA employees to become and remain members in good standing in Local 689, under Section 103(a) of the labor agreement they must, in accordance with Local 689's By-Laws and the Constitution and General Laws of the International Amalgamated Transit Union, pay to Local 689 an amount of money equivalent to the initiation fee, monthly dues and assessments regularly paid by Local 689 members. Such funds are used by the Union for collective bargaining purposes. (Affidavit of James M. Thomas, Jr., Plaintiff's Complaint, ¶ 5).

### III

 The first question before the court[3] is whether the WMATA compact is federal law and thus controlling by its terms over the Virginia Right to Work Statute by way of the Supremacy Clause.[4] In *Cuyler v. Adams,* 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981) the Supreme Court held that the test for whether an interstate compact becomes federal law is whether it "is a congressionally sanctioned interstate compact within Art. I, § 10 of the Constitution."[5] 449 U.S. at

---

**2.** All prior labor agreements between WMATA and Local 689 dating back to November 1, 1972, also contained union shop provisions identical to Section 103(a).

**3.** The court notes in passing that clearly this case does not involve a "political question" which can only be resolved through legislative action. The interpretation of an interstate compact presents a question of federal law which is properly addressed to the Federal Courts. *Cuyler v. Adams,* 449 U.S. 433, 422, 101 S.Ct. 703, 708–709, 66 L.Ed.2d 641 (1981). For analysis of the "political question" doctrine *see Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962).

**4.** U.S. Const. Art. VI, cl. 2. provides:

This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made under the Authority of the United States, shall be the Supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

**5.** The compact clause Art I, § 10 cl. 3 provides, "No State shall, without the Consent of Congress, ... enter into any Agreement or Compact with another State...."

439, 101 S.Ct. at 707. "Where Congress has authorized the States to enter into a cooperative agreement, and where the subject matter of that agreement is an appropriate subject for congressional legislation, the consent of Congress transforms the States' agreement into federal law under the Compact Clause." 449 U.S. at 440, 101 S.Ct. at 707. Following *Cuyler*, to determine whether the WMATA compact is federal law, the court must find that (1) there was congressional legislation authorizing the WMATA compact, and (2) such legislation was an appropriate subject for congressional legislation. The court's analysis on this issue is made easy by the Fourth Circuit's decision in *WMATA v. One Parcel of Land in Montgomery County, Maryland*, 706 F.2d 1312 (4th Cir.1983). In *One Parcel of Land*, the Fourth Circuit ruled that WMATA's "quick take" condemnation powers pursuant to § 82 of the compact were superior to the Maryland Constitution which expressly prohibited "quick take" condemnations. The Fourth Circuit employed the *Cuyler* test in finding that the WMATA compact became federal law when consented to by Congress:

> Applying the *Cuyler* test here, there is, of course, no dispute that Congress enacted a law consenting to the WMATA Compact. *See* Pub.L. No. 89–774, 80 Stat. 1324 (1966), *reprinted at* [1966] U.S.Code Cong. & Ad.News 1547–79. Nor can there be any doubt that this was an appropriate area for federal legislation. WMATA is charged with developing and operating a mass transit system for the District of Columbia and the surrounding Maryland and Virginia suburbs. As such, WMATA's activities have substantial impact on interstate commerce and are appropriate for congressional legislation under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3. In addition, WMATA's powers to construct and operate a mass transit system primarily located in the District of Columbia undoubtedly fall within congressional jurisdiction to legislate for the District of Columbia, U.S. Const. art. I, § 8, cl. 17. We conclude, therefore, that the two-part test from *Cuyler* is satisfied here, and that the WMATA Compact became federal law when consented to by Congress.

*Id.* at 1317–1318. The court finds *One Parcel of Land* to be controlling on this issue and therefore finds that the WMATA compact is federal law.[6]

Because congressionally sanctioned interstate compacts within the meaning of Art. 1 § 10 of the Constitution are federal law, state laws inconsistent with the terms of these compacts are unenforceable as to agencies formed by these compacts. *WMATA v. One Parcel of Land*, 706 F.2d 1312, 1317–1319 (4th Cir.1983); *West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22, 32–33, 71 S.Ct. 557, 562–563, 95 L.Ed. 713 (1951) (Reed, J. concurring opinion), *see also Bush v. Muncy*, 659 F.2d 402 (4th Cir.1981) (holding provision of congressionally sanctioned compacts prevail over state law). It is therefore clear that if the WMATA compact authorizes WMATA to enter into labor agreements which contain union shop clauses, the Virginia Right-to-Work Law will not be applicable to any WMATA employees. The second question before this court is, therefore, whether the WMATA compact authorizes WMATA to enter into labor agreements which contain union shop clauses.[7]

Defendants argue that Section 66(b) of the compact expressly grants WMATA an exclusive method of resolving labor disputes. They also argue that Sections 12(g) and 77 provide further conclusive evidence that Virginia consented to this delegation of its authority concerning labor matters.

---

6. The court's finding is also supported by two district court decisions concerning WMATA. In *Hellmuth v. WMATA*, 414 F.Supp. 408 (D.Md. 1976) the court held that the Maryland Public Information Act was not applicable to WMATA. In *Gay Activists Alliance of Washington v. WMATA*, C.A. No. 78–2217 (D.D.C.1979) (unpublished) the court held that under the interstate compact WMATA was not subject to the D.C. Human Rights Act of 1977.

7. This question could also be posed in the form of whether under the terms of the WMATA compact, Virginia delegated its power to enforce its Right-to-Work Law as applied to WMATA employees.

Plaintiffs argue that there is no specific provision in the WMATA compact revoking the Virginia Right-to-Work Law and that the signatories and Congress were "promised" that the Virginia-based employees would continue to enjoy the "protection" of Virginia's Right-to-Work Law. As evidence of this "promise," plaintiffs provide a statement by S. Harrison Kahn, legal counsel for the Alexandria, Barcroft & Washington Transit Company,[8] made before the House Committee on the Judiciary in 1959. In this statement, Mr. Kahn evinces his understanding that the future interstate compact would not nullify the Virginia Right-to-Work Act for Virginia employees under the compact. *See* District of Columbia, Maryland, and Virginia Mass Transit Compact: Hearing on H.J., Res. 402 Before Subcomm. No. 3 of the Committee on the Judiciary, 86th Cong., 1st Sess., at 127 (1959).

Plaintiffs further argue that Section 66(e) of the WMATA compact provides evidence that this "promise" was never altered. Section 66(e) provides that no employees of any newly acquired transportation systems shall be placed in any "worse position" than he previously enjoyed with his prior employer.[9] Plaintiffs argue that being subject to a labor agreement containing a union shop clause is "worse" than being subject to a labor agreement containing an open shop clause and therefore Section 66(e) proscribes WMATA from entering into a collective bargaining agreement which contains a union shop clause with employees of newly acquired companies. Plaintiffs contend that because WMATA's entering into a collective bargaining agreement containing a union shop clause is proscribed in these instances by Section 66(e), it must be inferred that the signatories and Congress intended to preserve the right to work guarantee for Virginia-based WMATA employees.

Plaintiffs finally argue that WMATA's compliance with the Virginia Workmen's Compensation Act belies their position that they are not required to follow Virginia law concerning their Virginia-based personnel.

The court finds that the WMATA compact authorizes WMATA to enter into labor agreements which contain union shop clauses. Sections 66(b), 12(g), and 77 provide the proof.

Section 66(b) gives WMATA the authority to enter into collective bargaining agreements with unions over employees' "working conditions." It provides:

(b) The Authority shall deal with and enter into written contracts with employees as defined in section 152 of Title 29, United States Code, through accredited representatives of such employees or representatives of any labor organization authorized to act for such employees concerning wages, salaries, hours, working conditions, and pension or retirement provisions.

WMATA Compact, Section 66(b). The Senate Report concerning Section 66 of the compact emphasizes that it should be construed broadly to give WMATA great flexibility in dealing with labor disputes. This is because of the recognition that the curtailment of transportation activities or any work stoppages might seriously reduce the revenues of the Transit Authority necessary to meet outstanding obligations guaranteed by the federal government. *See* P.L. 92–349, S.Rept. 92–931, 92nd Cong., 2nd Sess., June 28, 1972, pp. 8.

It seems clear from the above that the signatories' intent was to make WMATA totally self-regulating in the labor area. Its unfettered authority to enter into collective bargaining agreements concerning its employees' work conditions must necessarily include the right to enter into a union shop agreement. *Compare Agesen v.*

---

**8.** Alexandria, Barcroft & Washington Transit Company was a privately owned bus carrier later purchased by WMATA.

**9.** Section 66(e) provides in pertinent part:

... No employee of any acquired transportation system who is transferred to a position

with the Authority shall by reason of such transfer be placed in any worse position with respect to workmen's compensation, pension, seniority, wages, sick leave, vacation, health and welfare insurance or any other benefits, than he enjoyed as an employee of such acquired transportation system.

*Catherwood,* 26 N.Y.2d 521, 311 N.Y.S.2d 886, 260 N.E.2d 525 (1970).

That Virginia delegated its power to enforce its Right-to-Work Law on WMATA employees is further shown in Sections 12(g) and 77 of the compact. Section 12(g) specifically exempts WMATA from the laws of the signatory states and the District of Columbia in employment matters. It provides:

> 12. In addition to the powers and duties elsewhere described in this Title, and except as limited in this Title, the authority may:
>
> \* \* \* \* \* \*
>
> (g) Create and abolish offices, employments and positions (other than those specifically provided for herein) as it deems necessary for the purpose of the Authority, and fix and provide for the qualification, appointment, removal, term, tenure, compensation, pension and retirement rights of its officers and employees without regard to the laws of any of the signatories.
>
> \* \* \* \* \* \*

WMATA Compact, Section 12(g).

The plain language of Section 12(g) exempts WMATA employment policies from all regulation by the signatories. Indeed this was expressly acknowledged in the U.S. Senate legislative history: "It is also recognized that the Authority, ... [is] necessarily exempt from the personnel laws of the signatories ..." [added] Rept. 1914, Calendar No. 1457, 89th Cong.2nd Sess., August 24, 1966, p. 22; Accord, Hearings of Subcomt. No. 3, 89th Cong., 2nd Sess., H.J.Res. 1163, July 20, 27 and August 3, 1966, pps. 131–133.

Section 77 is a general exemption provision that provides as follows:

> Except as otherwise provided in this Title, any transit service rendered by transit facilities owned or controlled by the Authority and the Authority or any corporation, firm or association performing such transit service pursuant to an operating contract with the Authority, shall, in connection with performance of such service, be exempt from all laws, rules, regulations, and orders of the signatories

and of the United States otherwise applicable to such transit service and persons, except that laws, rules, regulations and orders relating to inspection of equipment and facilities, safety and testing shall remain in force and effect; provided, however, that the Board may promulgate regulations for the safety of the public and employees not inconsistent with the applicable laws, rules, regulations, or orders of the signatories of the United States.

WMATA Compact, Section 77. This exemption from regulation has been strictly construed with the courts holding that the plain language of the statute provides that an individual signatory is prohibited from unilaterally subjecting the Authority to any legal burden or duty not specifically established by the compact. *See Pepco v. WMATA,* 221 Va. 632, 272 S.E.2d 214, 216 n. 1 (1980) (Holding exemption from regulation not in issue in WMATA's successful claim for application of state power rate to WMATA). *See also Hellmuth v. WMATA* 414 F.Supp. 408 (D.Md.1976); *Gay Activists Alliance of Washington, S.C., Inc. v. WMATA,* C.A. No. 78–2217 (D.D.C.1979); *District of Columbia v. WMATA,* C.A. No. 74–1682 (D.D.C., May 14, 1975).

The legislature history of the compact further makes clear the congressional intent to exempt WMATA from state laws in personnel matters. *See e.g.* the prepared statement of Jerome Alper, Esquire, counsel to the Joint Transportation Commission, the drafters of the WMATA compact:

> Questions have been raised covering the provisions of paragraph (g) of Sec. 12, authorizing the Authority to create a personnel system without regard to the laws of any of the signatories, and to Sec. 77 of the Compact exempting the Authority and its operations from existing regulation.
>
> These exemptions are necessary in order to enable the Authority to function at all. It must be borne in mind that the Authority is an instrumentality of each of

the three signatories and, as such, would be subject to the laws of each of these signatories in the absence of specific provisions in the Compact. Unless the Compact contained an exemption with respect to personnel matters, it is difficult to see how the Authority could not be subject to three separate, distinct and different laws regarding personnel.

\* \* \* \* \* \*

With respect to Sec. 77, dealing with regulation, exemption from the separate regulation of the several signatories and the United States is essential. This is necessary not only to avoid conflicting standards of regulation but in order to make the revenue bonds of the Authority saleable. The investment market will insist that the Authority be entirely self-regulating with respect to fares, service and other activities which affect net revenues. This is a practically universal requirement in all revenue bond financing.

Hearings of House of Representatives, Committee of the Judiciary, Subcommittee Report No. 3, 89th Cong., 2nd Sess., H.J. Res. 1163, July 20, 27, August 3, 1966, p. 235. *Accord* Senate Report 1491, Calendar No. 1457, p. 22, 89th Cong.2nd sess., August 24, 1966.

In light of the foregoing, it need hardly be said that the court finds the plaintiffs' arguments unpersuasive. The simple answer to their assertion that they were "promised" that the Virginia Right-to-Work Statute would remain applicable to Virginia employees of WMATA is that they should have gotten it in writing.[10] The plain language of the WMATA compact shows no evidence of this promise to preserve the Virginia Right-to-Work Statute, but rather clearly evinces an intent to the contrary.[11]

In summary, the court finds that the WMATA compact clearly grants the Authority the power to enter into collective bargaining agreements with Local 689 over employees working conditions. Implicit in its right to enter into collective bargaining agreements, WMATA has the authorization to enter into a union shop agreement such as Section 103(a) of its contract with Local 689. Because the WMATA compact is federal law, under the Supremacy Clause of the United States Constitution, the terms of the collective bargaining agreement must be given effect, the Virginia Right-to-Work Statute notwithstanding. *WMATA v. One Parcel of Land,* 706 F.2d 1312 (4th Cir.1983). Defendants' Motions for Summary Judgment will therefore be granted.

An appropriate Order shall issue.

10. The court does not give much credence to the plaintiffs' interpretation of Section 66(e), nor to the fact of WMATA's compliance with the Virginia Workmens Compensation Laws. The court finds plaintiffs' arguments concerning Section 66(e) to be strained at best. WMATA's compliance with Virginia's Workmens Compensation Laws also has no bearing on this case. Under Section 80 of the WMATA compact WMATA waives its immunity from suits in accordance with the law of the applicable jurisdiction. The Virginia Workmens Compensation Law is basically a tort statute which under Section 80 the authority has acknowledged it will honor. Unlike the situation concerning the Right-to-Work Statute, the WMATA compact expressly states that it will honor the tort laws of the signatories.

11. Gerald L. Baliles, the Attorney General of Virginia appears to have appropriately summarized Virginia's position in a letter to the National Right to Work Committee dated January 17, 1984. Mr. Baliles states, "the question is not one of enforcement of Virginia's Right-to-Work law; instead, it is one of recognition that the METRO compact approved by the Commonwealth years ago failed to include Virginia METRO workers under the Virginia Right-to-Work law." (Union Exhibit 4).