RALPH W. PARKS *v.* DAVID BOURBEAU ET AL.
(11253)

PETERS, HEALEY, PARSKEY, SHEA and GRILLO, Js.

Argued February 7—decision released May 29, 1984

*Andrew S. Liskov,* assistant public defender, for the appellant (plaintiff).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, for the appellees (defendants).

ARTHUR H. HEALEY, J. This appeal is from the dismissal of the plaintiff's application for a writ of habeas corpus attacking his detention under an extradition warrant[1] pursuant to which he is being held for extradition to authorities of the state of Florida.

The application for the writ alleges that the plaintiff, Ralph Parks, was arrested by the defendant, David Bourbeau, a Connecticut state trooper, on a rendition warrant issued by the governor of Connecticut under

---

[1] The Uniform Criminal Extradition Act is set out in the Connecticut General Statutes §§ 54-157 through 54-185.

date of October 10, 1980, that his extradition is sought by the state of Florida for the alleged crime of "Burglary into a Structure," and that he was arraigned on the rendition warrant on August 4, 1981, at which time he was advised of his rights to challenge this arrest pursuant to General Statutes § 54-166 and granted a continuance date[2] by which to file a habeas application. He alleged that his detention in Connecticut was illegal because of a number of claimed statutory and constitutional violations.

On October 12, 1979, Parks was arrested in Florida and charged with burglary of a structure.[3] Thereafter, he was released on his own recognizance but subsequently failed to appear. On July 14, 1980, the governor of Florida issued his requisition warrant accompanied by other documents for Parks' extradition. On October 2, 1980, Parks escaped from the Bridgeport Correctional Center where he was serving a sentence as a parole violator. On October 10, 1980, while Parks was still an escapee, the governor of Connecticut issued her rendition warrant and ordered his return to Florida. Her warrant was mailed together with her letter to Lieutenant Patrick Hedge of the Connecticut state police, who turned over the letter and the governor's warrant to Bourbeau. On January 13, 1981, Parks was arrested on the escape charge and returned to the Bridgeport Correctional Center. From his return there on January 13, 1981, to March 19, 1981, Parks was in custody at the correctional center in lieu of bond on the October 10, 1980, escape charge as well as serving time on another escape charge. On March 18, 1981, he was sentenced to a term of one year on the October, 1980, escape charge to be served consecutively to the term he was then serving. Bourbeau was aware from

---

[2] The plaintiff timely filed his application for the writ of habeas corpus.

[3] The Florida documents reveal that this charge involved his stealing a television from a motel room.

about January 13 or 14, 1981, that Parks was at the Bridgeport Correctional Center and he was also aware of Parks' sentencing on March 18, 1981.

On April 3, 1981, Parks was given department of correction form CN1041 entitled "Notification of Warrant/ Detainer" which informed him that a warrant and/or detainer, issued on October 10, 1980, had been filed against him.[4] That notification listed Florida as the jurisdiction making the charge of "Burglary of a Structure." On August 4, 1981, his sentence expired, and he was to be discharged at that time. Bourbeau arrested him on that date pursuant to the governor's rendition warrant of October 10, 1980.

On appeal, Parks claims error in that: (1) he was not substantially charged with a crime in Florida as required by Connecticut General Statutes § 54-159 because the finding of probable cause made in Florida and appearing on the face of the supporting documents is "palpably illegal and insufficient"; (2) he is not a fugitive from justice because his Connecticut arrest, based on the Florida "Affidavit of Probable Cause" was illegal and voided the arrest; (3) he was substantially deprived of his fourteenth amendment due process rights when he was not arrested under the Connecticut rendition warrant until ten months after its issuance because the arresting authorities knew he was in custody and deliberately withheld serving the warrant; and (4) he was similarly deprived of his fourteenth amendment due process rights because, although required by General Statutes § 54-82c, he was not given prompt notice of the rendition warrant and was not advised of his right to request disposition of that warrant. We find no error.

---

[4] At the evidentiary hearing on the application for the writ, Robert Gillis, the deputy warden at the Bridgeport Correctional Center, testified that when Parks was notified of this, he refused to sign a receipt of the notification. Parks did not testify at the hearing.

I

In support of his claim that he is not substantially charged with a crime[5] in Florida, the plaintiff urges us to hold that the requirement of "substantially charged" is not equivalent to a finding of probable cause. In doing so, he recognizes that the United States Supreme Court set down the general rule of *Michigan* v. *Doran,* 439 U.S. 282, 290, 99 S. Ct. 530, 58 L. Ed. 2d 521 (1978), that "when a neutral judicial officer of the demanding state has determined that probable cause exists, the courts of the asylum state are without power to review the determination." Yet, at the same time, he argues that this general rule has definite limitations which permit the asylum state, in a proper case, to review whether a plaintiff has been "substantially charged." Further, he maintains that if the asylum state itself determines that he is not "substantially charged," then the "traditional presumption of regularity"; *Michigan* v. *Doran,* supra; that attends the demanding state's judicial determination of reasonable grounds or probable cause has been rebutted and the illegality of the plaintiff's arrest in the demanding state established. This, in turn, he asserts, invalidates his Connecticut

---

[5] General Statutes § 54-159, entitled "Requirements for recognition of extradition demand" provides in relevant part: "No demand for the extradition of a person charged with crime in another state shall be recognized by the governor unless in writing alleging . . . that the accused was present in the demanding state at the time of the commission of the alleged crime, and that thereafter he fled from the state, and accompanied by a copy of an indictment found or by information supported by affidavit in the state having jurisdiction of the crime, or by a copy of an affidavit made before a magistrate there, together with a copy of any warrant which was issued thereupon; or by a copy of a judgment of conviction or of a sentence imposed in execution thereof, together with a statement by the executive authority of the demanding state that the person claimed has escaped from confinement or has broken the terms of his bail, probation or parole. The indictment, information or affidavit made before the magistrate must substantially charge the person demanded with having committed a crime under the law of that state . . . ."

arrest under its governor's rendition warrant. He claims that because the extradition proceedings in Connecticut are thus barred, he cannot be a "fugitive" as required under the extradition statute. General Statutes § 54-159; *Barrila* v. *Blake,* 190 Conn. 631, 634, 461 A.2d 375 (1983).

On the other hand, the defendant argues that the plaintiff is really attacking Florida's judicial finding of probable cause. The defendant maintains that the plaintiff, in claiming he is not "substantially charged," is actually saying that the presumption of regularity traditionally accorded the proceedings of the demanding state has been overcome when he claims that Florida's finding of probable cause is "palpably illegal."

"The Uniform Extradition Act implements the mandate of the extradition clause of the constitution of the United States, article four, § 2, clause 2, which provides: 'A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.' " *Barrila* v. *Blake,* supra. An extradition hearing in the asylum state " 'is limited to four questions, namely, (a) whether the extradition documents on their face are in order, (b) whether the plaintiff has been charged with a crime in the charging state, (c) whether the plaintiff is the person named in the request for extradition and (d) whether the plaintiff is a fugitive. *Cuyler* v. *Adams,* 449 U.S. 433, 443n, 101 S. Ct. 703, 66 L. Ed. 2d 641 (1981); *Michigan* v. *Doran,* 439 U.S. 282, 289, 99 S. Ct. 530, 58 L. Ed. 2d 521 (1978).' *Narel* v. *Liburdi,* [185 Conn. 562, 565, 441 A.2d 177 (1981), cert. denied, 456 U.S. 928, 102 S. Ct. 1974, 72 L. Ed. 2d 443 (1982)]; see *Glavin* v. *Warden,* 163 Conn. 394, 401, 311 A.2d 86 (1972); *Reynolds* v. *Conway,* 161 Conn. 329, 336, 288 A.2d 77

(1971)." *Wentworth* v. *Bourbeau,* 188 Conn. 364, 368, 449 A.2d 1015 (1982). In *Michigan* v. *Doran,* supra, the court said that "[u]nder Art. IV, § 2 [of the United States constitution], the courts of the asylum state are bound to accept the demanding state's judicial determination since the proceedings of the demanding state are clothed with the traditional presumption of regularity. In short, when a neutral judicial officer of the demanding state has determined that probable cause exists, the courts of the asylum state are without power to review the determination. Section 2, cl. 2, of Art. IV, its companion clause in § 1 and established principles of comity merge to support this conclusion." *Michigan* v. *Doran,* supra, 290. Recently, we have said that the requisite that one must be "substantially charged" requires that the charge be based upon "probable cause." *Wentworth* v. *Bourbeau,* supra; see *Michigan* v. *Doran,* supra, 296 (Blackmun, J., concurring); *Hill* v. *Blake,* 186 Conn. 404, 410–11, 441 A.2d 841 (1982). The question of whether the plaintiff was substantially charged with a crime in the state of Florida is one of law. *Wentworth* v. *Bourbeau,* supra; *Munsey* v. *Clough,* 196 U.S. 364, 372, 25 S. Ct. 282, 49 L. Ed. 515 (1905); *Smith* v. *Idaho,* 373 F.2d 149, 155 (9th Cir. 1967).

The documents from Florida include not only an information charging the plaintiff with the crime of burglary of structure[6] and a bench warrant, but also an "Affidavit of Probable Cause" together with a judicial finding of probable cause that the plaintiff had committed that crime. The plaintiff argues that the "traditional presumption of regularity" is facially rebutted by a reading of the affidavit of probable cause. The language of *Michigan* v. *Doran,* supra, which speaks to the "traditional presumption of regularity" must not

---

[6] The information articulates § 810.02 as the Florida statutory referent for the crime of burglary of a structure. The Florida judicial officer who made the finding of probable cause also certified that the crime constitutes a felony in the state of Florida.

be read in isolation but in context and particularly with the language immediately following it which is clearly to the effect that once a neutral judicial officer in Florida has determined that probable cause exists, the courts in Connecticut "are without power to review the determination." *Michigan* v. *Doran,* supra, 290. Thus, given the limitation of inquiry imposed by *Michigan* v. *Doran;* see *Wentworth* v. *Bourbeau,* supra, 368; the courts of this state will not review the finding of probable cause by the demanding state of Florida. Other courts have so held.[7] See, e.g., *Moore* v. *Miller,* 198 Colo. 24, 596 P.2d 64 (1979); *In re Consalvi,* 5 Mass. App. 729, 370 N.E.2d 707 (1977); *Olson* v. *Thurston,* 393 A.2d 1320 (Me. 1978); *Crabtree* v. *State,* 186 Mont. 340, 607 P.2d 566 (1980); *Ex parte Cain,* 592 S.W.2d 359 (Tex. Crim. App. 1980); *In re Everett,* 139 Vt. 317, 427 A.2d 349 (1981). The petitioner's claim that his arrest in Florida was without probable cause is properly to be addressed in Florida. Extradition is, ultimately, a matter of comity or compact between the states; it is mandated by the United States constitution by art. IV, § 2, Cl. 2 and the Uniform Criminal Extradition Act was drafted and enacted to implement the constitutional requirements of art. IV and to set forth procedures to be followed in this area. *Bailey* v. *Laurie,* 118 R.I. 184, 373 A.2d 482 (1977). "It is the constitutional duty of an asylum state to enforce the constitution's interstate rendition clause faithfully." *Brown* v. *Sharkey,* 106 R.I. 714, 716, 263 A.2d 104 (1970). As we have already pointed out, the United States Supreme Court in *Michigan* v. *Doran* has articulated the ambit of the inquiry by courts of the asylum state in extradition hearings. The documents demonstrate that the plaintiff was "substantially charge[d]" with having committed a crime in Florida; General Statutes § 54-159;

---

[7] Because the Uniform Criminal Extradition Act is a uniform law, decisions from other states provide guidance. See *Hill* v. *Blake,* 186 Conn. 404, 441 A.2d 841 (1982).

and the trial court did not err in refusing to go behind the judicial determination of probable cause in Florida.[8]

## II

The plaintiff next claims that he is not a fugitive from justice because his Connecticut arrest based upon the facts and circumstances set out in the "Affidavit of Probable Cause" from Florida was illegal and thereby voided and nullified the Connecticut arrest. This is the only basis upon which he claims he is not a fugitive under the act.[9] Had he prevailed on his first claim, this argument would have had merit. Because he did not, we must reject this claim.

## III

It is also claimed that there was a substantial deprivation of the plaintiff's fourteenth amendment due process rights because he was not arrested under the rendition warrant until ten months after its issuance even though the authorities knew he was in custody much of that time and still, he argues, deliberately withheld service of the warrant. Under this claim, he argues that once the governor's warrant was issued, the state

---

[8] In addition, we must reject the plaintiff's claim that his extradition violates his right to substantive due process guaranteed by the fourteenth amendment to the United States constitution and article first, §§ 8 and 9, of the Connecticut constitution. He claims that this is so because, despite the full faith and credit clause in article IV, § 1, and the extradition clause in article IV, § 2, of the United States constitution, the governor of Connecticut is obligated to protect people of this state from due process violations of the United States and Connecticut constitutions. The limitations imposed upon the scope of inquiry by courts of an asylum state by *Michigan* v. *Doran*, 439 U.S. 282, 99 S. Ct. 530, 58 L. Ed. 2d 521 (1978), have already been set out above; that alone answers this due process claim. Moreover, the petitioner may properly raise this claim in Florida.

[9] The inquiry whether a plaintiff is a fugitive from justice is one of fact which is to be resolved by the governor of the asylum state. *Glavin* v. *Warden*, 163 Conn. 394, 396, 311 A.2d 86 (1972). We have no need to decide this because of the nature of the plaintiff's claim that he is not a fugitive predicated as it is on his first claim of error which we have found to be without merit.

of Connecticut, by that action, waived its jurisdiction to proceed against him either by trial or continued punishment. He also claims that once the Connecticut governor issued her rendition warrant, it should have been executed and the unwarranted delay in serving it until August 4, 1981, was "deliberate, calculated and part of an established state police policy." He contends that his fourteenth amendment due process rights were violated because he was not arrested until nearly ten months after the issuance of the rendition warrant.

On the other hand, the defendant argues that this state did not lose jurisdiction of the plaintiff, as claimed, when the Connecticut governor issued her rendition warrant and that the period of delay, which is much less than the plaintiff claims, did not in this case result in any denial of due process. Even assuming a due process violation, the defendant argues that the plaintiff has not claimed or demonstrated that he was prejudiced. He contests the claim of deliberate and calculated delay, pointing out that there was no such evidence although conceding that there was evidence that the course followed was that of state police policy in similar cases. Finally, he points out that the circumstances of the plaintiff's status as an escapee from jail, on October 2, 1980, his being at large as an escapee until January 13, 1981, his return to jail to finish the sentence he had been serving and to await the disposition of the self-imposed escape charge, his sentencing on that charge on March 17, 1981, and serving that sentence imposed clearly show reasons for the delay in serving the rendition warrant. In any event, the defendant argues the delay does not attenuate the viability of the rendition warrant and extradition will not be barred.[10]

_____

[10] In connection with the foregoing claims is also the plaintiff's claim that because he was not given prompt notice of the rendition warrant and not advised of his right to request disposition of this warrant which, he argues, was mandated by General Statutes § 54-82c, he was substantially deprived

Winnowing these claims and the responses to them discloses one basic question: Does the fact that the Connecticut governor's rendition warrant of October 10, 1980, was not served on the plaintiff until August 4, 1981, bar the plaintiff's extradition to the state of Florida? The answer is that it does not. It must be recognized that "[t]he Extradition Clause was intended to enable each state to bring offenders to trial as swiftly as possible in the state where the alleged offense was committed." *Michigan* v. *Duran,* supra, 287. "The right

of his fourteenth amendment due process rights. He also claims that "[i]f it is argued" that the "detainer" lodged on April 3, 1981, invoked the "Agreement on Detainers" as provided for in General Statutes § 54-186, then his argument that his due process rights were violated is the same because § 54-82c (c) and article III (c) of § 54-186 are similar in content and meaning. The defendant, however, claims neither § 54-82c nor the "Agreement on Detainers" is applicable to this case, but rather the sole issue is whether there was compliance with the Uniform Criminal Extradition Act. We conclude that in the circumstances of this case neither of these statutes bars this plaintiff's extradition to Florida.

General Statutes § 54-82c, which is entitled "Prisoner's right to speedy trail on pending charges" provides in part: "(a) Whenever a person has entered upon a term of imprisonment in a correctional institution of this state and, during the continuance of the term of imprisonment, there is pending in this state any untried indictment or information against such prisoner, he shall be brought to trial within one hundred twenty days after he has caused to be delivered, to the state's attorney or assistant state's attorney of the judicial district or geographical area, in which the indictment or information is pending, and to the appropriate court, written notice of the place of his imprisonment and his request for final disposition to be made of the indictment or information. . . .

"(c) The warden, community correctional center administrator or other official having custody of the prisoner shall promptly inform him in writing of the source and contents of any untried indictment or information against him concerning which the warden, administrator or other official has knowledge and of his right to make a request for final disposition thereof. . . ."

It is apparent that this statute applies to a person imprisoned in Connecticut when there is pending in Connecticut an untried indictment or information against him. Such is not the case here, and § 54-82c is inapplicable.

Likewise, we also need not reach his claim under article III (c) of the "Agreement on Detainers"; General Statutes § 54-186; which provides: "The warden, commissioner of correction or other official having custody of the prisoner shall promptly inform him of the source and contents of

of extradition has long been recognized as belonging to the demanding state and not to the fugitive. *Ker* v. *Illinois,* 119 U.S. 436, 7 S. Ct. 225, 30 L. Ed. 421 (1886); *Frisbie* v. *Collins,* 342 U.S. 519, 72 S. Ct. 509, 96 L. Ed. 541 (1952), rehearing denied, 343 U.S. 937, 72 S. Ct. 768, 96 L. Ed. 1344; *U.S. ex rel. Fort* v. *Meiszner,* 319 F. Sup. 693 (N.D.Ill. 1970)." *United States ex rel. McInery* v. *Shelley,* 524 F. Sup. 499, 502 (N.D.Ill. 1981). "[T]he right of each state to extradition of a charged felon is constitutionally guaranteed rather than statu-

---

any detainer lodged against him and shall also inform him of his right to make a request for final disposition of the indictment, information or complaint on which the detainer is based."

This is so for at least two reasons. First, we note that the plaintiff's brief concedes that he was "given" the "Notification of Warrant/Detainer" form and his "claim" is that this notification "seemed as if it was a detainer." Significantly, what it seemed like to him cannot really be determined because he chose not to testify at the habeas hearing and, in any event, on the record before us he did absolutely nothing about it at all after the notification was given him on April 3, 1981. Even if we assume, arguendo, that it was a detainer, then under article III of the agreement, i.e., General Statutes § 54-186, he could have utilized that triggering mechanism available to him but it is clear that on April 3, 1981, he even refused to acknowledge that he was given the notification. In any event, any violation of the expeditious and orderly disposition of any untried indictments, informations or complaints in another jurisdiction which the interstate detainer agreement seeks to accomplish within its parameters may properly be addressed in Florida. See *Narel* v. *Liburdi,* 185 Conn. 562, 441 A.2d 177 (1981), cert. denied, 456 U.S. 928, 102 S. Ct. 1974, 72 L. Ed. 2d 443 (1982). Second, if we assume, arguendo, that the detainer agreement was applicable, even if the plaintiff's custodian in Connecticut did not inform the plaintiff of the source and contents of a detainer lodged against him and inform him of his right to make a request for a final disposition of the pending charge in the foreign jurisdiction; General Statutes § 54-186, article III (c); that still would not bar extradition as long as the requisition documents satisfied the four criteria of *Michigan* v. *Doran,* 439 U.S. 282, 99 S. Ct. 530, 58 L. Ed. 2d 521 (1978).

In *Narel* v. *Liburdi,* supra, we concluded that extradition was proper even where the Connecticut custodian of the habeas plaintiff refused, after a triggering request by the plaintiff, to notify the state of Virginia of his desire for a prompt disposition of a Virginia charge pursuant to interstate agreement on detainers. The case of the plaintiff Parks, insofar as he makes a claim under the interstate agreement on detainers, is much weaker than that in *Narel* v. *Liburdi,* supra.

tory." *In re Fabricant,* 118 Cal. App. 3d 115, 118, 173 Cal. Rptr. 245 (1981). The interstate extradition act was intended to complement the extradition clause of the federal constitution by providing the procedural mechanism for the summary disposition of extradition cases. *Narel* v. *Liburdi,* 185 Conn. 562, 441 A.2d 177 (1981), cert. denied, 456 U.S. 928, 102 S. Ct. 1974, 72 L. Ed. 2d 443 (1982); *Glavin* v. *Warden,* 163 Conn. 394, 395 n.1, 311 A.2d 86 (1972).

We have already determined that the Florida documents satisfied the criteria laid down in *Michigan* v. *Doran,* supra. It follows that the governor's rendition warrant properly issued on October 10, 1980. The plaintiff argues, however, that the delay in serving the warrant was "deliberate, calculated and part of an established state police policy"[11] and that such a delay effected a "pocket veto" of the governor's warrant which defeats extradition. He also argues that when the governor's warrant did issue, that amounted to a waiver of Connecticut's jurisdiction to proceed any further against him by trial or continued punishment.[12] We reject both of these claims.

Bourbeau testified that the warrant was not served until August 4, 1981, in accordance with the usual use of "the rule of thumb." His explanation of that was "if [the fugitive's] sentence in Connecticut was more than a year and he was going to be incarcerated more than a year . . . we would have made a report back to the [Connecticut] Attorney General's office, [and] we probably would have recommended for the state of Florida

---

[11] There is no evidence that the alleged "deliberate or calculated" component of this claim was contrived or planned as to *this* plaintiff who did, as the evidence disclosed, escape from jail *after* Connecticut authorities had conducted their investigation and asked the governor of Connecticut to issue her rendition warrant.

[12] No elaborate discussion is necessary to point out that the unique self-help undertaken by the plaintiff by his escape on October 2, 1980, prevented any service upon him of that warrant until January 13, 1981.

that they file a detainer." This is so although the Connecticut authorities were still under the direction of the governor's warrant. If, however, a person sought to be extradited was to be incarcerated in Connecticut less than a year, apparently the warrant would be served on the termination of that sentence.[13] Bourbeau testified that this case was unusual because the escape charges from the October 2, 1980 escape came after "we applied for the governor's warrant." Bourbeau also indicated that "we knew escape charges had been brought against him, and we were waiting for him to either be dismissed or to be sentenced . . ." or for the sentence to elapse. They "don't interfere [with the state's attorneys] in their prosecution as far as people held within the state for the governors' [sic] warrants." Bourbeau also stated that on March 18, 1981, when the plaintiff was sentenced on the October, 1980 escape charge, Bourbeau knew that the plaintiff was in the custody of the commissioner of corrections.

The plaintiff places great reliance on *Application of Caudill,* 352 P.2d 926 (Okla. Crim. 1960). This reliance is misplaced. In *Caudill,* two agents of the Oklahoma crime bureau arrested Caudill on May 14, 1959, as a

---

[13] During questioning of Bourbeau by the court, the following took place: "The Court: Is there any reason you make a distinction between a sentence of six months and ten years?

"The Witness: We usually use the rule of thumb, if it's reasonable. If his sentence was more than a year and he was going to be incarcerated more than a year, in other words there is a difference of giving a man a year and he is out in four months, but if he is going to be more than a year we would have made a report back to the Attorney General's office, we probably would have recommended for the state of Florida that they file a detainer.

"The Court: Your testimony is that if the sentence is more than a year you would report back to Florida, at which time they would then lodge a retainer [sic]?

"The Witness: Yes.

"The Court: Although you were under a direction by the governor at that time to arrest him, is that correct?

"The Witness: That's correct."

fugitive from Louisiana. Oklahoma authorities from another Oklahoma county "claimed" Caudill to finish service of an old incompleted jail sentence and fine which he had avoided by escaping years before—in 1949. Thereafter, on May 20, 1959, the governor of Louisiana requisitioned Oklahoma for Caudill on a Louisiana crime and on May 27, 1959, the governor of Oklahoma issued his rendition warrant. The Oklahoma sheriff holding Caudill temporarily refused to execute the governor's warrant until such time as the old judgment had been satisfied and he notified the Louisiana sheriff at Baton Rouge that his sentence would expire on January 20, 1960. The Oklahoma authorities never took him before an Oklahoma judge or magistrate as provided for by the Oklahoma statutes (Uniform Criminal Extradition Act § 14, 9 U.L.A. 300),[14] until he filed a petition for habeas corpus on July 1, 1959. On that date, the governor's warrant "was served but not executed." The court agreed with the petitioner's due process claim stating that because of the "total failure of the officers to comply with the requirements of the statute, there can be no other logical conclusions than that the petitioner was denied due process of law by the arresting officer's failure to take him before a magistrate . . . ." *Application of Caudill*, supra, 929. Despite its conclusion of a denial of due process, that court said that had the petitioner "presented" his writ of habeas corpus before he was booked into jail to complete service of his outstanding sentence, "he would apparently have

---

[14] The language of the Oklahoma statute tracks the language of Connecticut General Statutes § 54-170, which is entitled "Arrest without a warrant" and provides: "The arrest of a person may be lawfully made also by any peace officer or a private person, without a warrant, upon reasonable information that the accused stands charged in the courts of a state with a crime punishable by death or imprisonment for a term exceeding one year, but when so arrested the accused shall be taken before such a judge with all practicable speed and complaint shall be made against him under oath setting forth the ground for the arrest as in section 54-169; and thereafter his answer shall be heard as if he had been arrested on a warrant."

been entitled to his release," but that the sheriff, "having his escaped prisoner in custody, was within the law in holding him on the uncompleted judgment and sentence." Thus, the court concluded that "the petitioner was not entitled to a writ of habeas corpus so long as he was being so held." *Application of Caudill,* supra. Noting that he was "so in custody," on July 1, 1959, when the governor's warrant was served on him, the *Caudill* court then said that "[a]n apparent conflict arises between the governor's warrant and the state's right to require the petitioner to complete service of the old judgment and sentence which he was then serving. The asylum state has the right to require the satisfaction of the sentence before complying with the demands of a requisitioning state." *Application of Caudill,* supra. It also said, however, that the requisition of the Louisiana governor "was in no way affected by what preceded it." *Application of Caudill,* supra, 929.

The *Caudill* court then framed the real issue in this fashion: "The decisive question as applied to the facts in this case is in whom was the authority to determine this issue of custody of the petitioner, the local Sheriff, or the Governor of the asylum state? In short, does the Sheriff have a right to temporarily delay by pocket veto the Governor's extradition warrant until a local judgment and sentence is satisfied by the petitioner?" *Application of Caudill,* supra, 930. The Oklahoma court recognized that if the Oklahoma governor had desired to require the petitioner to complete the unsatisfied portion of his sentence, he could have done so, but it acknowledged that he did not do so. Significantly, while the *Caudill* court strongly condemned[15] the Oklahoma

---

[15] The *Caudill* court, in criticizing the local sheriff's conduct, said: "In any event, it was not for the local Sheriff to pigeon-hole the order of the highest executive authority of the state. Once the Governor had spoken, it was no longer within the Sheriff's power to ignore his order. What had been done was within the Governor's power to do. . . . The Sheriff's act in holding petitioner after issuance of the Governor's extradition warrant

sheriff for his delay in serving the rendition warrant of the governor of Oklahoma; *United States ex rel. McInery* v. *Shelley,* supra, 501 n.5; it still concluded that his conduct did not bar the extradition of the habeas petitioner to Louisiana. *Application of Caudill,* supra, 930–31. It is therefore clear that *Caudill* does not avail the plaintiff the relief which he seeks in this case.

Our examination of other cases involving similar issues further establishes that the plaintiff's claims directed to the conduct of authorities in the asylum state cannot be successfully asserted to bar Florida's right to extradition. Courts have recognized that "no deterrent function is served by punishing a demanding state for the wrongful actions of the asylum state, 'for the consequence of the illegal conduct of [the asylum state's officials] is visited upon a sovereign that can do nothing to prevent or punish that conduct.' *People ex rel. Taylor* v. *Johnson,* 47 Ill.2d 103, 105, 264 N.E.2d 198, 199 (1970); cf. *State* v. *Harbaugh,* 132 Vt. 569, 576, 326 A.2d 821, 825 (1974)." *In re Saunders,* 138 Vt. 259, 263, 415 A.2d 199 (1980).[16] This underscores the primacy of the right of the demanding state to the return of charged felons. See, e.g., *United States ex rel. McInery* v. *Shelley,* supra, 501 (extradition from Illinois

---

was an invasion of the Governor's power. Under that warrant the State of Louisiana was entitled to custody of petitioner. The most the Sheriff could have done under the premises was to have called the Governor's attention to the partially unsatisfied judgment and sentence so that the Governor could have recalled or modified the extradition order under such conditions as the law permits. . . . In any event, the Governor's order is the highest executive voice within the state and may not be ignored under the within conditions by a lesser member of the executive family." *Application of Caudill,* 352 P.2d 926, 930–31 (Okla. Crim. 1960).

[16] This case must be distinguished from those cases arising under the Interstate Agreement on Detainers; see General Statutes § 54-186; such as *Giardino* v. *Bourbeau,* 193 Conn. 116, 475 A.2d 298 (1984) and *Narel* v. *Liburdi,* 185 Conn. 562, 441 A.2d 177 (1981), cert. denied, 456 U.S. 928, 102 S. Ct. 1974, 72 L. Ed. 2d 443 (1982), where officials in the demanding and asylum states are regarded as agents for each other by virtue of having so agreed by being parties to the Interstate Agreement on Detainers.

to Mississippi ordered despite an almost three year delay between issuance of Illinois governor's warrant in January, 1977, and the institution in Illinois in November, 1979, of action to actually execute that warrant).[17]

Moreover, additional considerations require us to reject the plaintiff's claims for relief. Initially, as the well-reasoned case of *United States ex rel. McInery* v. *Shelley,* supra, points out, there are critical differences between a criminal trial and an extradition proceeding. In *McInery,* the court cited with approval the case of *People ex rel. Vasquez* v. *Pratt,* 24 Ill. App. 3d 927, 930–31, 322 N.E.2d 74 (1975). It characterized the distinction made in *Vasquez* as follows: "[T]here is a critical difference between the nature of a criminal proceeding and an extradition proceeding. The [*Vasquez*] court stated that evidentiary rules and constitutional principles of due process must be rigidly adhered to in the criminal trial since its purpose is to determine the guilt or innocence of the accused. Extradition, however, is a right which belongs to the demanding state. It contemplates only a summary and ministerial proceeding, the primary purpose of which is to return a fugitive to the demanding state so that he can stand trial."

---

[17] The *McInery* court referred to *Application of Caudill,* 352 P.2d 926 (Okla. Crim. 1960), which was relied upon by petitioner McInery. In doing so, it observed that "[a]lthough the *Caudill* court strongly condemned the sheriff's [Oklahoma] actions, the court ordered that the fugitive's extradition be effected immediately—and not that the extradition be stopped." *United States ex rel. McInery* v. *Shelley,* 524 F. Sup. 499, 501 n.5 (N.D. Ill. 1981). The same court also said: "Similarly, in *Lott* v. *Heyd,* 315 F.2d 350 (5th Cir. 1963), a fugitive sought habeas corpus relief claiming that Louisiana, the asylum state, had held him beyond the statutory period permitted to await extradition to Mississippi, the demanding state. The court said that even if the appellant had been held for a time without legal authority, 'no federally protected rights were violated and to hold that Louisiana's alleged misbehavior deprived Mississippi of its Constitutional right to the fugitive would amount to allowing the State of Louisiana to amend the Constitution.' 315 F.2d at 351. The appellant was ordered to be extradited." *United States ex rel. McInery* v. *Shelley,* supra.

*United States ex rel. McInery* v. *Shelley,* supra, 504; see generally, *Maldonado, petitioner,* 364 Mass. 359, 361–62, 304 N.E.2d 419 (1973).

Further, in habeas corpus review of extradition proceedings, we look to the legality of the cause for detention existing at the time of the arrest on the governor's rendition warrant which, "if otherwise valid, supplies sound, present legal cause even though there may have been prior illegality. See *Stallings* v. *Splain* [253 U.S. 339, 343, 40 S. Ct. 537, 64 L. Ed. 940 (1920)]; *In re Bryant* [129 Vt. 302, 366, 276 A.2d 628 (1971)]." *In re Brown,* 346 N.E.2d 830, 832 (Mass. 1976). Because we have already determined that the governor's rendition warrant satisfied the criteria of *Michigan* v. *Doran,* supra, once that warrant was executed any claimed prior illegality on the part of Connecticut authorities concerning extradition became moot. See, e.g., *In re Bryant,* 129 Vt. 302, 366, 276 A.2d 628 (1971); *Alkerton* v. *Wingenbach,* 217 N.W.2d 787, 791 (N.D. 1974), citing, inter alia, *Glavin* v. *Warden,* 163 Conn. 394, 311 A.2d 86 (1972); *Levick* v. *Smedley,* 553 P.2d 482, 484 (Alaska 1976); *Stynchcombe* v. *Whitley,* 241 Ga. 776, 242 S.E.2d 720 (1978); *Commonwealth* v. *Brown,* 421 A.2d 1131, 1134 (Pa. Super. 1980); *People ex rel. Vasquez* v. *Pratt,* supra.

Our conclusion that extradition is not barred is consistent with the teachings of *Michigan* v. *Doran* and its progeny which "have reaffirmed the narrow compass of issues which may be considered in a challenge to extradition by habeas proceedings in the asylum state. See *Cuyler* v. *Adams,* 449 U.S. 433, 101 S. Ct. 703, 709 n.11, 66 L. Ed. 2d 641 [1981]; *Pacileo* v. *Walker,* 449 U.S. 86, 101 S. Ct. 308, 66 L. Ed. 2d 304 (per curiam) [1980]." *Pfaff* v. *Wells,* 648 F.2d 689, 692 (10th Cir. 1981). *Pfaff* specifically said, *"Michigan* v. *Doran* defines the issues which a federal court may address in a habeas action resisting extradition." *Pfaff*

v. *Wells,* supra, 689. It is important that in *Pacileo,* the United States Supreme Court reversed the decision of the Supreme Court of California in an extradition case where that court had directed one of its own trial courts of general jurisdiction to conduct an inquiry into the present conditions of the Arkansas penal system. In doing so, the court said that the Supreme Court of California had "ignored the teachings" of *Michigan* v. *Doran,* supra, and *Sweeney* v. *Woodall,* 344 U.S. 86, 73 S. Ct. 139, 97 L. Ed. 114 (1952), reh. denied, 344 U.S. 916, 735 S. Ct. 332, 97 L. Ed. 706 (1953). *Pacileo* v. *Walker,* 449 U.S. 86, 101 S. Ct. 308, 66 L. Ed. 2d 304 (1980), reh. denied, 450 U.S. 960, 101 S. Ct. 1421, 67 L. Ed. 2d 385 (1981). The Michigan Supreme Court has recognized that *Michigan* v. *Doran* as reinforced by *Pacileo* v. *Walker,* demonstrates the "extremely narrow role" of asylum state courts in extradition matters. *Brown* v. *Wayne County Sheriff,* 415 Mich. 658, 674, 681, 330 N.W.2d 335 (1982). One court characterizes the "extremely limited" role of the judiciary in extradition cases by saying that once the governor has granted extradition, a judicial consideration of release upon habeas corpus is limited to passing upon the criteria set down by *Michigan* v. *Doran,* and "[a]ny other judicial inquiry in the asylum state into the matter exceeds the court's jurisdiction." *In re Fabricant,* 118 Cal. App. 3d 115, 120, 173 Cal. Rptr. 245 (1981). It is quite clear that "[i]t is the duty of both federal and state courts 'to administer extradition in accord with the construction placed on the federal constitutional and statutory provisions by the Supreme Court.' *DeGenna* v. *Grasso,* 413 F. Supp. 427, 431 (D. Conn.), aff'd sub nom. *Carino* v. *Grasso,* 426 U.S. 913, 96 S. Ct. 2617, 49 L. Ed. 2d 368 [1976]." *Pfaff* v. *Wells,* supra, 692.

The authorities we have set out lead us to the following conclusions: Even assuming the plaintiff's claim that he was substantially deprived of his fourteenth amend-

ment due process rights when he was not arrested under the rendition warrant until ten months after its issuance even though he was in custody much of that time and the arresting authorities knew of his confinement and deliberately withheld service of the warrant, Florida's right to extradition is not barred. Moreover, the limited review imposed upon asylum states by *Michigan* v. *Doran* and its progeny was properly had and determined in the trial court. The delay between the issuance and execution of the governor's rendition warrant did not vitiate that warrant. Once it was served, the plaintiff was properly in the defendant's custody. His subsequent habeas cannot successfully challenge his custody in Connecticut other than that under the governor's rendition warrant. Because of what we have said, we need not reach or decide the plaintiff's due process claims. Whatever claim he makes concerning the propriety of his detention in Connecticut prior to the service of the governor's warrant certainly does not bar the right of the state of Florida to extradite him. The trial court did not err in dismissing the petition.

There is no error.

In this opinion the other judges concurred.