Charles TUNGATE Plaintiff

v.

Maryellen THOMS, et al. Defendants

No. CIV.A. 01–271–JMH.

United States District Court,
E.D. Kentucky,
Lexington Division.

Feb. 13, 2002.

Charles Tungate, FMC–Lexington, Lexington, KY, Pro se.

Mason Moore Kessinger, U.S. Attorney's Office, EDKY, Lexington, KY, for Kathleen M. Hawk–Sawyer, defendants.

David A. Arthur, Attorney General's Office, Indianapolis, IN, for William O. Smith, defendant.

## MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

This matter is before the court upon the motions of (1) Defendant Smith, by counsel, to dismiss or for summary judgment [Record No. 10]; (2) Defendant Sawyer–Hawk, by counsel, to dismiss or for summary judgment [Record No. 15]; Plaintiff Tungate for discovery and leave to amend his complaint [Record Nos. 19–20].

### BACKGROUND

On July 5, 2001, the plaintiff, a prisoner at the Federal Medical Center in Lexington, Kentucky, paid the requisite filing fee and submitted a *pro se* civil rights action, complaining of a detainer which had been lodged against him by officials of Decatur County, Indiana. Naming numerous defendants within the Federal Bureau of Prisons ("BOP") and in Indiana, he sought to have the detainer removed and he also sought damages, including punitive damages. The plaintiff specifically claimed (1) violations of the provisions and underlying policy of the Interstate Agreement on Detainers Act ("IAD"); (2) a violation of the plaintiff's right to a speedy trial, as guaranteed by the Constitution; (3) a conspiracy among the defendants to violate the plaintiff's rights under the IAD and the United States Constitution; and (4) the illegality of enforcing certain paragraphs in BOP Program Statement (PS) 5130.06, attached to the complaint, on the grounds that it was enacted after the plaintiff began the IAD process and it violates the IAD's underlying policy, the U.S. Constitution, and the plaintiff's federal rights.

On September 4, 2001, Senior Judge Henry R. Wilhoit, Jr. issued a Memorandum Opinion and Order [Record No. 2] setting forth the above-listed claims; reciting a chronology of events with regard to the detainer; dismissing a number of defendants and claims for reasons stated in the order; and ordering that summons issue for BOP Director Kathleen Hawk–Sawyer, individually and officially for injunctive relief and for Decatur County Prosecutor William O. Smith, in his official capacity for injunctive relief and his individual capacity for damages. *Id.*

After the instant case was reassigned to the undersigned, in November of 2001, both defendants filed the dispositive motions before the court today. The plaintiff has filed responses to both motions and his own motions. Before addressing those motions, however, the court will recount the plaintiff's version of the facts and applicable law.

### PLAINTIFF'S ALLEGATIONS

The following is a summary or construction of the factual allegations and legal

bases the plaintiff presents in his complaint and exhibits attached thereto [Record No. 1].

The detainer at issue herein was filed by the Decatur County Sheriff's Department on or about January 15, 1999. On January 28, 1999, the FMC–Lexington warden provided the plaintiff with the formal IAD notice of the untried charges against him and of his right to request their disposition. Exhibit [hereinafter "Ex."] A. This document identifies the state drug charges against him and gives the address of prosecuting attorney Smith. *Id.* The plaintiff responded by asking that the warden file an IAD request for disposition of the charges for him and signing thereon that he understood the terms to which he was agreeing, including the fact that his request would be "deemed to be a waiver of extradition." *Id.* Accordingly, on February 8, 1999, the warden executed and forwarded an IAD "Offer to Deliver Temporary Custody" of the plaintiff to defendant prosecutor Smith (Ex. B); and the plaintiff signed another IAD document, which is also attached and in which he acknowledges his understanding that the transfer would be only temporary from federal to state custody, with his being returned to federal custody at the conclusion of the state trial.

On July 1, 1999, the plaintiff was removed from federal custody at FMC–Lexington and brought before the court in Indiana, Case No. 16CO1–98–CV–87. After his arraignment, he was returned to federal custody in Lexington on July 7. The plaintiff states that his trial was originally set for November 21, 1999, but this date was rescheduled to January 18, 2000; the second trial date was also rescheduled, with a third trial date of March 7, 2000 being set.

Four days before the scheduled trial, on March 3, 2000, with no notice or opportunity to object to the state's taking custody of him again, the plaintiff was removed from the federal prison for the second time and placed in the custody of the County of Decatur. However, the plaintiff states that he refused to enter into a plea agreement, and the trial did not take place, a fourth trial date being set for August 21, 2000. Meanwhile, the plaintiff was returned to federal custody on April 15, 2000. Later in April, on the 18th, the state court denied a motion to dismiss the charges and permitted the plaintiff's attorney to withdraw from his case.

At some point in May of 2000, the plaintiff filed a *pro se* motion in the state trial court, to dismiss the case against him for the trial court's failure to comply with certain provisions of the IAD. He argued then, and now, that dismissal of the charges was required because IAD Article III(d) and Article IV(e) both provide that if a state takes custody of a prisoner and returns him without the trial being had, then the indictment or information "shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice." Also, Article IV(a) requires that when the state requests the prisoner's custody, "there should be a period of thirty (30) days after receipt by the appropriate authorities before the request be honored . . . ," but the instant plaintiff was not given this period of time in which to object to his second taking by the State of Indiana. Ex. D. The plaintiff claims not to have received any ruling on this motion at the time of filing the complaint, one year later; he does not explain what happened to the fourth trial date, that of August 21, 2000.

The plaintiff began the year 2001 by requesting that the BOP remove the detainer, setting out the above stated sequence of events and IAD claims. The warden's response was that (1) all of the postponements of his trials were accom-

plished under the terms of the IAD; (2) she is obligated to enforce BOP P.S. 5130.06, which requires that a detainer stay in place and that the federal authorities continue to release the detainee upon later requests from charging state, until written authorization to remove the detainer is received from the charging state; and (3) officials at the prison had made certain efforts in his behalf and received the following indication that the detainer would soon be removed:

> The Inmate Systems Manager contacted the authorities at Decatur County in reference to your detainer and learned the prosecutor's office will enter a motion to have you released on your own recognizance on the pending case and have the detainer removed. Upon receipt of this document from the detaining authority, the detainer will be removed.

Ex. A. However, a month later, the plaintiff's appeal to the Regional Office concluded, "No written request for detainer removal has been received to date." *Id.* The May 17, 2001 response of the national office was that (1) the BOP cannot grant the plaintiff relief from the detainer, as only the charging state court can rule on any IAD violation; (2) the BOP's hands are tied until the Decatur County Sheriff's Office requests removal of the detainer, the response providing the address thereof so that the plaintiff could contact that office directly; and (3) Program Statement 5130.06 does not violate the law.

The plaintiff filed the instant lawsuit claiming that the pendency of the detainer was harming him as follows: (1) preventing him from being transferred to a lower security institution closer to his family; (2) keeping him in a higher, more violent and hostile environment; and (3) barring his access to participation in a drug program, which could net him a year off of his current sentence and six months in a halfway house. Therefore, the detainer also

violates several of the underlying policies of the IAD, as stated in Article I, and violates the mandate in Article IX to liberally construe to effectuate the policies.

### DEFENDANT SMITH'S MOTION

In response to the complaint, Defendant Smith has filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12, or for entry of summary judgment in his favor pursuant Fed.R.Civ.P. 56; the motion is supported by an attached memorandum [Record No. 10]. The defendant prosecutor informs the court that on May 22, 2001, the state charges against the plaintiff in Decatur County were dismissed. A certified copy of the order of dismissal is Record No. 12. Therefore, when the instant lawsuit was filed in July of 2001, there was no case or controversy and none exists today. He cites to well-known Supreme Court law regarding the constitutional need for a controversy at the time of filing of the lawsuit and at the time a decision is rendered. Since the plaintiff has received the only injunctive relief which could be provided him, *i.e.*, dismissal of the charges, his claim for injunctive relief must be dismissed.

As to the plaintiff's claim for damages from this defendant, Smith argues that, as a prosecutor, he is absolutely immune under the holding and rationale of *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). He also cites to another district court's disposition of a claim against a prosecutor for violating Article IV(e)'s anti-shuttling provision with the grant of absolute immunity. *Bush v. Muncy*, 659 F.2d 402, 413 (4th Cir.1981), *cert. denied*, 455 U.S. 910, 102 S.Ct. 1259, 71 L.Ed.2d 449 (1982). Defendant Smith asks the same resolution with regard to the damages claim against him.

*The Plaintiff's Response*

The *pro se* plaintiff has filed a response [Record No. 16] accusing the prosecutor of using his office to harass the plaintiff and to win dismissal of the instant lawsuit through fraud. He contends that the defendant knew his obligations under the IAD and the Constitution and intentionally violated them. The plaintiff states that his position is that after he initiated the IAD proceedings in 1999 by requesting a disposition of the Indiana charges, as provided under Article III, and he was released to the temporary custody of Indiana authorities, upon his return to federal custody without the state trial taking place, he was entitled to immediate dismissal of the charges. However, the Indiana sought to obtain custody again in 2000. Since this second transfer of custody was instituted by the prosecutor, Article IV applies. Under this portion of the statute, subsection (a) provides for a 30–day period after the prosecutor's request and before the prisoner can be transferred; and IV(e), like III(d), provides that if the trial is not had prior to the prisoner's being returned to the sending state, then the plaintiff is entitled to dismissal of the charge.

Under the plaintiff's theory of his case, when he was returned to federal custody on July 9, 1999, after his first transfer to Indiana, he was entitled to release of the detainer and its deleterious impact under Article III(d). Also, when he was taken for the second time, he was denied not only Article IV(a)'s 30 days time to fight the illegal taking, but also was again robbed of his right to dismissal of the charges upon his April 15, 2000 return without a trial, in violation of Article IV(e). The detainer remained in effect until June 11, 2001, when the BOP finally removed it upon notice of the Indiana court's dismissal of the charges the month before.

The plaintiff relies upon the Supreme Court case of *Alabama v. Bozeman*, 533 U.S. 146, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001), which held that IAD Article IV(e) bars further proceedings if the prisoner is returned to the sending state before trial is completed; a prisoner's first transfer of custody, even if for only one day and even if only for arraignment and even if only across the state line a few miles away, triggers the requirement that he be tried within the time limits set by the IAD provisions; the prisoner's premature return without disposition of the charges must result in dismissal of the charges against him. The plaintiff also liberally quotes from that portion of the opinion which points out that in the prosecutor-initiated provisions of Article IV, the thirty days between the prosecutor's request and the transfer of the prisoner are to provide an opportunity for the prisoner to fight the transfer of custody. The plaintiff argues that his IAD claims are meritorious; his complaint about the detainer's continued presence over a two-year period has not been mooted; and the prosecutor's actions are capable of repetition.

As to his claim for damages, the plaintiff argues that *Imbler* does not support the defendant-prosecutor's contention, because *Imbler* dealt with the role of the prosecutor as an advocate in the judicial proceeding, and specifically did not consider the question if the prosecutor were acting in the role of an administrator or investigative officer. Under Article VII of the IAD, state governors are to appoint an administrator for carrying out the purposes of the IAD; and that is the role defendant Smith was fulfilling. Moreover, beyond looking at the role of an official, the court is to look at the functional nature of the activity complained of and the prosecutor's objective knowledge of his misconduct. In this examination, he urges the court to deny this defendant absolute immunity, because he knew the requirements of the statute; knowingly violated them

anyway; and did so as an administrator, not as an advocate. In further support of his claims against this defendant, the plaintiff attaches exhibits which cast doubt on the validity of the state court's order of May 22, 2001 order of dismissal and which include a copy of an Indiana Supreme Court opinion in a case which purportedly is unrelated to the instant one but shows a pattern of harassment against the plaintiff.

### DEFENDANT HAWK–SAWYER'S MOTION

Federal Defendant Hawk–Sawyer of the BOP has also filed a motion [Record No. 15] to dismiss pursuant to Fed.R.Civ.P. 12(b) for the plaintiff's failure to state a claim and/or to exhaust his state court remedies or, in the alternative, for entry of summary judgment in her favor, pursuant to Fed.R.Civ.P. 56. She relies on an attached memorandum, declaration and other documents.

This defendant begins with a recitation of events from the time the detainer was filed against the plaintiff in January of 1999. In the declaration of a BOP senior attorney, the defendant admits that the plaintiff was twice transferred to Indiana custody; contends that the trial was "postponed both times under the terms of the IAD"; and states that the detainer was removed on June 7, 2001. Ex. 1. The declarant also admits the plaintiff has exhausted the BOP administrative remedy process. Attachments include a copy of the June 7, 2001 notice to Decatur County Sheriff that the detainer had been removed. According to this defendant, the plaintiff's estimated release date, via good conduct time, is December 11, 2003.

As to the moving defendant's legal claims with regard to the IAD, she first argues that the BOP violated no provision of the IAD; rather, FMC–Lexington staff notified the plaintiff of the detainer; advised him of his rights; completed the necessary forms for him to initiate proceedings under Article III; and forwarded the documents to the Decatur County Prosecutor and Clerk of Court's office on February 8, 1999, all of these actions being in compliance with the provisions of Article III. As to the plaintiff's allusions to constitutional violations, this defendant argues that there can be no due process violation based upon the IAD or the Federal Extradition Act at 18 U.S.C. § 3182; neither gives rise to a liberty interest because there is no applicable extradition treaty, nor has the federal government signed the Uniform Extradition Act; and the IAD itself has been interpreted to not require a pre-transfer hearing when going from federal to state custody, the defendant citing *Atkinson v. Hanberry,* 589 F.2d 917, 919 (5th Cir.1979). As to the plaintiff's constitutional speedy trial claim, unless the plaintiff establishes that he availed himself fully of the state machinery to the point of exhausting his state court remedies, then the claim is not properly before the federal court. This defendant asserts that the detainer issue has been mooted and so this court lacks subject matter jurisdiction over the matter.

As to the plaintiff's request that the defendant be enjoined from enforcing PS 5130.06 at paragraph 16 and 16a, the defendant contends that the plaintiff does not meet the high requirements for permanent injunctive relief, as recently stated in *Dayton Area Visually Impaired Persons, Inc. v. Fisher,* 70 F.3d 1474, 1480 (6th Cir. 1995), *cert. denied,* 517 U.S. 1135, 116 S.Ct. 1421, 134 L.Ed.2d 545 (1996). She argues that since the detainer has been removed, the plaintiff cannot and has not to date been able to demonstrate any likelihood of irreparable harm, as he is now able to participate in the programs he desires; to the extent that the plaintiff seeks to have this defendant disobey the IAD or not enforce its own program statement, the

BOP and the public would be ill-served; and for all of the above reasons, the plaintiff is not likely to succeed on the merits of his claim.

Finally, the moving defendant argues that this court's issuance of injunctive relief would violate the Prison Litigation Reform Act of 1995 (PLRA), which precludes entry of such an order with respect to conditions of confinement without the finding of a violation of the plaintiff's constitutional rights. 18 U.S.C. § 3626(a)(1). As the instant plaintiff has stated no constitutional claim herein, injunctive relief is, therefore, barred. Finally, Hawk–Sawyer contends that based upon the attached declaration and well-known Supreme Court law, she is entitled to entry of judgment in her favor, the plaintiff having failed to state a deprivation of clearly established legal rights or to present any evidence that this defendant committed any acts that violated the law.

*Plaintiff's Response*

The plaintiff has responded [Record No. 18] with arguments and additional exhibits, most of which are IAD forms purportedly to demonstrate the defendants' knowledge of the provisions of the IAD even while taking actions contrary thereto.

With regard to the IAD, the plaintiff continues to quote liberally from its provisions, *Bozeman,* and *Cuyler v. Adams,* 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981). He states that the IAD gave rise to his expectation that after his first return from Indiana custody, there would be no second transfer and, should the prosecutor initiate one, he would have the protections of Article IV. However, when the prosecutor came for him a second time, in 2000, this defendant did not provide him the thirty-day "grace period" to challenge the matter, and had enacted a new provision in PS 5130.06, so that the warden had to continue to give effect to the detainer.

The result was a violation not only of the IAD but also of the plaintiff's Fifth Amendment due process and Eighth Amendment rights; the APA; and the Extradition Act. He resents the declarant's contention that the Indiana continuances were pursuant to the IAD; he insists that he never waived his rights under the IAD or the Extradition Act, but the BOP summarily sent him to Indiana again. Additionally, the plaintiff states that the instant matter is not moot, because a violation of the IAD occurred, and he will amend his complaint, if permitted by the court, to add other defendants and claims with regard to the second, illegal transfer to Indiana authorities.

As to his claim for injunctive relief, the plaintiff argues that the same factors mentioned by the defendant weigh in favor of its grant. He claims that his projected release date is August, not December 11, 2003, and stresses that he has already lost an opportunity to take advantage of a three-year apprentice program in Prison Industry; time is running short to see if he will be able to take advantage of the drug program and thereby get one year off of his sentence; and he has already lost the close ties he had with his common-law wife and with his daughter, because of the inability to be transferred closer to them during the last two years. Additionally, he maintains that the violations of his rights are clear and so there is no doubt that he will be successful on the merits. He argues not only that the defendants will not be harmed to discontinue paragraphs 16 and 16a of PS 5130.06, but also that the general public good will be enhanced because of the public interest in effective rehabilitation programs, which will not be foreclosed or interrupted by the detainers which must currently be repeatedly enforced under the program statement. Finally, he argues that Defendant Hawk–Sawyer is not entitled to a summary judg-

ment because she was instrumental in implementing that portion of the program statement objected to and the program statement violates the terms of the IAD and undermines the salutory purposes thereof.

## PLAINTIFF'S MOTIONS

The plaintiff has also filed motions in response to the defendants' pleadings. One is a motion [Record No. 20] to amend his complaint. First incorporating his original complaint, he then seeks to add additional Indiana authorities and BOP employees as defendants, *i.e.*, Federal Medical Center Systems Inmate Manager M.F. Willis, who is charged with ensuring that the IAD is followed at FMC–Lexington; John and Jane Doe, staff members; another prosecuting attorney for the County of Decatur, James Rosenberry; and IAD Compact Administrator for the State of Indiana, Art Hegewald.

Additionally, the plaintiff seeks to formally assert his claims that his second transfer to Indiana was a result of the defendants' conspiracy; was violative of his Fifth Amendment rights to due process and equal protection; and violated his Eighth Amendment right to be free of cruel and unusual punishment. The plaintiff alleges that the federal defendants implemented the complained of paragraphs in PS 5130.06 for the purpose of preserving funds from the federal government, rather than losing funds, when they release a prisoner to state custody. As to the state defendants, their goal was allegedly to have the federal government foot the bill for pre-trial detainees such as the plaintiff. These were purportedly the reasons behind the defendants' providing repeated custody transfers and their failure to provide the thirty-day opportunity for him to protest. The plaintiff also suggests that all of the defendants were acting within the custom established by their respective entities; and, therefore, the City of Greensburg, County of Decatur, in the State of Indiana, and the BOP should be liable for damages.

As to amending the relief requested, the plaintiff asks for his "status" back as of July 7, 1999, when he was returned for the first time from Indiana, until May 22, 2001, when the Indiana charges were dismissed. He also asks this to court enjoin states, cities, and counties from again receiving a prisoner who has been taken into custody under the IAD and then returned, and to direct them to institute laws, regulations, or policies to prevent multi-shuttling. Finally, he seeks damages in the amount of four million dollars.

The plaintiff has also filed a motion for discovery [Record No. 19], seeking information in the form of five types of data, to support his claims of a conspiracy among the defendants and their alleged financial motivation for violating the IAD. Defendant Hawk–Sawyer has opposed [Record No. 21] the discovery on the grounds that it is premature with motions to dismiss pending, and that the requests are overly broad, numbers 1 and 4, in particular, being also unduly burdensome.

## STANDARDS FOR DISMISSAL/SUMMARY JUDGMENT

Fed.R.Civ.P. 12(b) provides for the dismissal of claims and parties for seven listed reasons. Subsection (b)(6) provides for dismissal for failure to state a claim upon which relief can be granted. Thereafter Rule 12(b) continues, in pertinent part, as follows:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in

Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

*Id.* Thus, the plain language of Rule 12(b) permits a 12(b)(6) motion to be converted into a motion for summary judgment. Fed.R.Civ.P. 12(b); *Haase v. Sessions,* 835 F.2d 902, 905 (D.C.Cir.1987). As to what matters may be considered under this subsection, see also 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1357 (2nd ed. 1990) ("In determining whether to grant a Rule 12(b)(6) motion, the Court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account.") (cited in *Nieman v. NLO Inc., et al.,* 108 F.3d 1546 (6th Cir.1997)).

If affidavits go to the underlying claim and the Court considers them pertinent to its ruling on the Rule 12(b)(6) motion for failure to state a claim, then the Court "shall" convert the motion into one for summary judgment pursuant to Rule 56. Because the court has considered the affidavits submitted by the defendants, as well as other exhibits of the parties, the court will consider the motion as one for summary judgment.

In determining a motion for summary judgment, the court must determine whether there are "no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Cor-*

*poration v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Supreme Court of the United States has directed that a court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial; "metaphysical doubt" is insufficient. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). The significant question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–53, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of showing there is an absence of evidence to support a claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). After a moving party carries its burden, the non-moving party must go beyond the pleadings to designate by affidavits, depositions, answers to interrogatories, and admissions on file, specific facts showing that there is a genuine issue of material fact for trial. *Id.* If the non-moving party completely fails to prove an essential element of his or her case, then all other facts are rendered immaterial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

As the court begins its analysis under these standards, all facts, and any inferences that may be drawn from the facts must be viewed in the light most favorable to the non-movant. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

### DISCUSSION OF IAD

#### Applicable Provisions

The Interstate Agreement on Detainers Act, § 2, 18 U.S.C.A.App. 2, is a compact among the states, the District of Columbia,

and the federal government which enables participating states to gain temporary custody of prisoners incarcerated in another jurisdiction in order to try the prisoner on pending criminal charges. *See generally United States v. Mauro,* 436 U.S. 340, 349–53, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978); *Reed v. Farley,* 512 U.S. 339, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994). Initially drafted by the Council of State Governments in 1956 and included in the Council's Suggested State Legislation Program for 1957, the IAD contains mandatory procedures for the prisoner who is charged in another jurisdiction, the prison officials where he is incarcerated, and the states in which the charges are pending; it also contains specifically required time limits, after which a pending charge must be dismissed. *Id.*

The IAD provides two different procedures whereby a prisoner may be taken from his current custodian in the "sending state" and transferred to the "receiving state," which is where charges are pending and trial is to be had on the criminal indictment or information. See definitions in Article II. Article III contains the procedures for a prisoner to initiate the proceedings. He makes the request for a final disposition of the charges, through the warden, as happened herein; and after the prosecuting officer has received the request, the prisoner must be brought to trial within 180 days. In contrast, Article IV contains a different procedure whereby the prosecutor may initiate proceedings to gain temporary custody of the prisoner; under this procedure the prosecutor is required to commence the trial within 120 days. The rights/responsibilities which are contained in and flow from each article are distinct, depending on who initiated the proceedings.

The plaintiff charges that the defendants have entered into the IAD and are thus bound by its terms, but they have violated certain provisions thereof. The first is Article III, which applies because he is the one who requested disposition of the charges against him. Article III includes the following relevant provision:

(d) Any request for final disposition made by a prisoner pursuant to paragraph (a) hereof shall operate as a request for final disposition of all untried indictments, informations, or complaints on the basis of which detainers have been lodged against the prisoner .... If trial is not had on any indictment, information, or complaint contemplated hereby prior to the return of the prisoner to the original place of imprisonment, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

18 U.S.C.A.App. 2, Article III(d). Therefore, when the plaintiff was returned to federal custody the first time without trial, on July 7, 1999, under this provision he was then entitled to dismissal of the charges.

Further, according to the plaintiff's theory, his later return to Indiana in 2000 was initiated by the charging/receiving state's prosecutor; therefore, Article IV applied and it was violated in two respects. Its procedures require:

The appropriate officer of the jurisdiction in which an untried indictment, information, or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party State made available ... upon written request for temporary custody or availability .... [Provided,] That there shall be a period of thirty days after receipt by the appropriate authorities before the request be honored, within which period the Governor of the sending State may disapprove the re-

quest for temporary custody or availability, either upon his own motion or upon motion of the prisoner.

*Id.* at Article IV(a). Article IV also contains the "anti-shuttling" provision, which is like Article III(d) and even has some identical language:

(e) If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

*Id.* at Article IV(e).

The plaintiff claims that the underlying policies of the IAD, as evidenced in Articles I and IX, are also being thwarted by the defendants. Article I provides expressly:

[I]t is the policy of the party States and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints. The party States also find that proceedings with reference to such charges and detainers, when emanating from another jurisdiction, cannot properly be had in the absence of cooperative procedures. It is the further purpose of this agreement to provide such cooperative procedures.

*Id.* at Article I. "This agreement shall be liberally construed so as to effectuate its purposes...." *Id.* at Article IX.

It is also the plaintiff's position that BOP Program Statement 5130.06, at paragraph 16 and 16a, was enacted after the plaintiff initiated Article III of the IAD and runs contrary to the express and other underlying purposes of the IAD. The provisions of the program statement to which the plaintiff objects read in their entirety as follows:

16. *CHALLENGES TO AN INMATE'S IADA RIGHTS.* If an inmate says that his or her rights have been violated under the IADA, the inmate will be advised to contact the state authorities or his or her attorney. The Bureau does not decide the validity of the detainer or violation of any IADA provision. All detainers will remain in full force and effect, unless and until the charges from the "receiving state" are dismissed and/or the receiving state authorizes, in writing, the removal of the detainer.

a. *Return of Inmate Before Completion of Proceedings.* If the inmate is returned to the "sending state" before the completion of all state court proceedings, the "sending state" will honor the "receiving state's" request for temporary custody. Regardless of the outcome, the detainer will remain on file. The original IADA paperwork suffices to return the inmate to the "receiving state." Requirements applicable to the initial temporary transfer for custody will still apply.

Ex. A. Therefore, the plaintiff's request for injunctive relief from the federal defendant is that these provisions not be enforced.

*Preliminary Matters*

■ Prisoners challenging detainers must first exhaust remedies under the Interstate Agreement on Detainers before seeking relief in federal courts. Usually, after exhaustion, they then file a petition under 28 U.S.C. § 2241. *See Grant v. Hogan,* 505 F.2d 1220 (3rd Cir.1974). However, a civil rights action for damages caused by an alleged violation of the IAD, such as the instant case, has also been authorized in *Cuyler v. Adams,* 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981).

Exhaustion of administrative remedies is also required before bringing such civil rights lawsuits. *See* 42 U.S.C. § 1997e. The prisoner in the instant action states that he invoked the IAD remedies; that he raised the IAD claims in the state trial court; and that he has exhausted the BOP remedy process.

The IAD does not explicitly grant authority to courts in the sending/custodial jurisdiction to render a detainer invalid or to dismiss another jurisdiction's charges underlying the detainer. Authority to render a detainer invalid and to dismiss the underlying charges is afforded to the charging, and not the sending, jurisdiction. IAD Articles III(d); IV(e); V(c). However, as the court previously noted [Record No. 2], the Honorable Scott Reed, presiding in this court, has ruled that a sending jurisdiction may quash a detainer when the petitioner's speedy trial rights have been violated; the charging state has been afforded additional notice, time, and opportunity to initiate proper proceedings; and the charging state has failed to act. *Schofs v. Warden, FCI, Lexington,* 509 F.Supp. 78 (E.D.Ky.1981). Also, another district court has ordered the federal defendants having custody of a prisoner about whom the State of Georgia was deciding whether to prosecute, as follows: "Insofar as the detainer may adversely affect, or have affected, [the prisoner's] custodial status at FCI–Danbury or the conditions of his confinement, defendants shall give no effect to the detainer." *Degina v. Carlson,* 1986 WL 15401 at *5 (D.Conn.1986). *See also Burrus v. Turnbo,* 743 F.2d 693 (9th Cir.1984), *vacated as moot sub. nom. Hijar v. Burrus,* 474 U.S. 1016, 106 S.Ct. 562, 88 L.Ed.2d 548 (1985). As to the availability of a monetary award, this court has previously referred the parties to *Bush v. Muncy,* 659 F.2d 402, 413–14 (4th Cir.1981), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1259, 71 L.Ed.2d 449 (1982).

### IAD Claims Against the Federal Defendant

To the extent the plaintiff originally sought to have the BOP remove the detainer against him, his request for injunctive relief has been mooted, as he has obtained the relief he requested from the federal defendant. However, the plaintiff has also sought injunctive relieve in the form of prohibiting this defendant from enforcing PS 5130.06 at paragraphs 16 and 16a on the ground that they violate the IAD. Therefore, the plaintiff proceeds to examine the surviving IAD claims against the federal defendant, Hawk–Sawyer, Director of the BOP.

The plaintiff does not deny that the FCI–Manchester warden filled out the proper paperwork for him to initiate disposition of the charges against him under Article III. However, under the plaintiff's theory of the case, the United States, as the IAD sending state, enacted in 1999 and enforced against the plaintiff in 2000 a program statement which is contrary to the IAD in its clear terms and in effect. He argues that his later, second return to the receiving state under the same terms as his initial transfer was illegal because the defendant thereby (1) permitted his being taken into Indiana custody a second time, in violation of Article III(d); (2) denied him the statutory protections for prosecutor-initiated proceedings to which he was entitled under Article IV, including paragraph (a)'s 30 day grace period for him to challenge the taking; and (3) kept the detainer on file against him to his detriment for two years after he was entitled to dismissal, upon his first return to federal custody.

 Article III, which the plaintiff triggered upon his request for disposition, specifically provides that his request would "be deemed to be a waiver of extradition." *Id.,* Article III(e). Moreover, de-

spite the plaintiff's current denial of waiving extradition, he signed a document stating that he understood this exact language. The effect of the program statement, then, merely recognizes that the waiver is continuing. A waiver, once made with counsel, may be considered continuing thereafter. Indeed, courts have held that a waiver of rights under the IAD need not even be knowing and intelligent. *United States v. Eaddy,* 595 F.2d 341 (6th Cir.1979); *United States v. Moses,* 1996 WL 363921 (E.D.Pa.1996), *affirmed,* 124 F.3d 189 (3rd Cir.1997)

In such a case, if Article III still applies because the petitioner had initiated the IAD proceedings in 1999, the federal defendant has not violated the provisions thereof because Article III of the IAD places no duty on the sending state after its notification to the receiving state's prosecuting officers that the prisoner is initiating proceedings to dispose of the charges. Article III(a)-(c). There is simply no remedy therein to provide for the sending state's removal of a detainer; it is the receiving state court's duty to dismiss the indictment or information. Article III(d).

Article IV has the same dismissal language aimed at the receiving state. The plaintiff relies on the language in Article IV(e) requiring dismissal and on *Alabama v. Bozeman,* wherein the Supreme Court of the United States recently held that Article IV(e) bars further proceedings in the receiving state if the prisoner is returned to the sending state before trial was completed, based upon the mandatory language in that subparagraph (e), *i.e.,* that the receiving state's court "shall" dismiss the proceedings if the prisoner is returned to the sending state before trial is completed. However, the Court did not address any role for the sending state. Therefore, *Bozeman* does not support the plaintiff's claims against the federal defendant, as the sending state official, who has no obligations under Article IV(e).

The court concludes that the plaintiff has failed to state a claim under either IAD Article III(d) or under IAD Article IV(e) against the federal defendant for a violation of statutes aimed only at the receiving state. Moreover, under *Bozeman,* a plan by the defendants to preserve funds is not of itself illegal or harmful to the plaintiff. The Supreme Court recognized that there may be legitimate reasons for returning a prisoner prior to resolution of the charges, stating, "[O]ur decision does not bar a receiving state from returning a prisoner when it would be mutually advantageous and the prisoner accordingly waives his rights under Article IV(e)". *Cf. Hill,* 528 U.S. at 114–115, 120 S.Ct. 659 ... (holding that defendant may waive his rights under Art. III of the Agreement). 533 U.S. at 155–56, 121 S.Ct. at 2086 (citing *New York v. Hill,* 528 U.S. 110, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000)).

■ Consistent with the IAD's not placing disposition burdens on the sending state, paragraph 16 of the program statement at issue herein provides that the BOP, as the sending state, will not decide the validity of the detainer or of any claimed IAD violation, but will continue the detainer in place and advise the inmate to contact his attorney or the receiving state authorities. Even federal courts in the sending state will not dismiss a detainer, because such would be inconsistent with the IAD. *Degina v. Carlson,* 1986 WL 15401 (D.Conn.1986); *Schofs,* 509 F.Supp. at 80.

■ As to subparagraph 16a, requiring the federal authority, as the sending state, to honor every request of the receiving state for temporary custody and to continue to return the inmate to the receiving state under the same paperwork, again, there is nothing in the IAD which forbids

it. In fact nothing in the IAD is contrary to such treatment and much is consistent therewith. As aforediscussed, the receiving state and the petitioner have the burden to obtain or challenge the second taking, not the sending state. It would be contrary to logic and the statutory scheme to have the BOP challenge court orders and prosecutor requests.

The plaintiff also claims that the sending authority violated the IAD by not providing him with the thirty (30) days necessary for him to challenge the second taking as illegal. The plaintiff again seeks to characterize the second move to Indiana as a new prosecutor-initiated proceeding, in order to make this claim, which arises only under Article IV(a). To support this claim, the plaintiff relies on another Supreme Court case, *Cuyler v. Adams,* 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981), wherein a prisoner brought a civil rights action based upon his transfer from the sending state of Pennsylvania to the receiving state of New Jersey without the 30-day opportunity to have a pre-transfer hearing. The Court summarized the first paragraph of Article IV as follows:

> Paragraph (a) performs two functions. First, it provides the means by which the receiving State may request the custody of a prisoner incarcerated in the sending State. Second, it authorizes the Governor of the sending State to disprove that custody request either on his own motion or on that of the petitioner.

*Id.* at 446, n. 13, 101 S.Ct. 703. The Court found that in light of the purposes of the IAD, its language, and its legislative history, a prisoner whose custody is being transferred via Article IV of the IAD is entitled to an extradition hearing, because the IAD preserves a prisoners state rights, including Section 7 of the Uniform Criminal Extradition Act, adopted in the sending state. A reading of the opinion, however, reveals that the Court was concerned with a prisoner's having the opportunity to challenge extradition as a state law to which he was entitled and was not concerned with the length of the time taken to exercise those state rights.

■ *Cuyler* is not applicable herein, however. In the instant case, the sending state is the United States and the United States is not a signatory to the Uniform Extradition Act. Rather, 18 U.S.C. § 4085, providing for the Attorney General to transfer federal prisoners to state custody, contains no provision for a hearing, only proper documentation. Consistent with the analysis in *Atkinson v. Hanberry,* 589 F.2d 917 (5th Cir.1979), this court finds that the sending state herein, the United States, was not required to provide an opportunity for a hearing. *Mann v. Warden of Eglin Air Force Base,* 771 F.2d 1453 (11th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986); *Turner v. United States Parole Comm'n,* 129 F.3d 127, 1997 WL 709353 (9th Cir.1997).

The instant plaintiff had an attorney and an opportunity to raise his IAD arguments to the receiving state's trial court. For this reason and because he was not entitled to challenge his extradition from federal to state custody under any federal law, the plaintiff again fails to present any claim of a violation under the IAD which the federal defendant committed and which caused him any damage.

*IAD Claims Against the State Defendant*

As to Defendant Smith, the Decatur County prosecutor, the court agrees that in May of 2001 the plaintiff obtained the injunctive relief sought from this defendant, *i.e.,* dismissal of the outstanding charges against the plaintiff. As to any entitlement to damages, the plaintiff's request therefor will be denied on immunity grounds.

■ A prosecutor is afforded absolute immunity from suit under § 1983 when the complained-of activity is "intimately associated with the judicial phase of the criminal process" or performed in a "quasi-judicial" role. *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Pusey v. City of Youngstown*, 11 F.3d 652, 658 (6th Cir.1993), *cert. denied*, 512 U.S. 1237, 114 S.Ct. 2742, 129 L.Ed.2d 862 (1994). In *Imbler*, it is true, absolute immunity attaches only to a prosecutor's actions which clearly involve his or her "role as advocate for the State," *see* 424 U.S., at 431, n. 33, 96 S.Ct. 984, and not necessarily his or her role as " 'administrator or investigative officer,' the protection for which the Court reserved judgment in *Imbler*, *see id.*, at 430–431, and n. 33, 96 S.Ct. 984." *Burns v. Reed*, 500 U.S. 478, 486, 111 S.Ct. 1934, 1938, n. 2, 114 L.Ed.2d 547 (1991). A prosecutor acting in an investigative or administrative capacity is protected only by qualified immunity. *Id.; Pusey v. City of Youngstown*, 11 F.3d 652, 658 (6th Cir. 1993), *cert. denied*, 512 U.S. 1237, 114 S.Ct. 2742, 129 L.Ed.2d 862 (1994).

"Sixth Circuit precedent has established that 'the critical inquiry is how closely related is the prosecutor's challenged activity to his role as an advocate intimately associated with the judicial phase of the criminal process.' " *Pusey v. City of Youngstown*, 11 F.3d 652, 658 (6th Cir. 1993), *cert. denied*, 512 U.S. 1237, 114 S.Ct. 2742, 129 L.Ed.2d 862 (1994) (citing *Joseph v. Patterson*, 795 F.2d 549, 554 (6th Cir. 1986), *cert. denied*, 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed.2d 516 (1987)).

■ Prosecutors are cloaked with immunity from all decisions regarding prosecution except those "deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification." *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). A prosecutor is absolutely immune from liability for damages based upon his decisions regarding the initiation of a prosecution. *See Meade v. Grubbs*, 841 F.2d 1512, 1532 (10th Cir.1988); *Fields v. Soloff*, 920 F.2d 1114, 1119 (2d Cir.1990). It follows that continuing a prosecution and resisting dismissal of those charges should similarly cloak the prosecutor in absolute immunity.

■ Viewing the facts and inferences in the light most favorable to the plaintiff, the court concludes that even if the prosecutor knowingly relinquished custody of the plaintiff without obtaining a waiver and later sought custody of the plaintiff a second time in order to advance the prosecution against him, in violation of the shuttling provisions of the IAD, he is cloaked in absolute immunity because his actions are intimately associated with his role as prosecutor. Absolute prosecutorial immunity is not defeated by showing that a prosecutor acted wrongfully or even maliciously because the decision to prosecute is unquestionably advocacy, and is, therefore, at the heart of *Imbler*. *See Grant v. Hollenbach*, 870 F.2d 1135, 1138 (6th Cir. 1989). The plaintiff points to no authority whereby a prosecutor in similar circumstances was denied absolute immunity. To the contrary, *see Blakely v. United States*, 276 F.3d 853 (6th Cir.2002) (Prosecutor's decision not to agree to vacate a civil forfeiture judgment, like his decision to institute the forfeiture action, is in the nature of advocacy rather than administrative conduct, and is therefore covered by absolute immunity); and *Bush v. Muncy*, 659 F.2d at 402.

Accordingly, Defendant Smith is also entitled to dismissal from the instant lawsuit, as the request for injunctive relief from him has been mooted and the request for damages is barred by the doctrine of absolutely immunity.

### Conclusion Regarding Defendants' Motions

The remainder of the plaintiff's claims are also meritless. No trial was had in Indiana and the plaintiff did not exhaust the state court remedies with regard to his IAD challenges or continuances; so his rights to a speedy trial under the IAD, the Speedy Trial Act, or the Constitution were not viable claims. Again, he got what he wanted, dismissal of the charges. Nor has the plaintiff stated a claim under the due process or equal protection clauses of the Fifth Amendment. Further, he cites to no support for his claim of a violation of the Administrative Procedure Act. Additionally, the plaintiff has presented no Eighth Amendment claim, which would provide relief only for prisoners required to endure conditions which amount to deprivation of "life's necessities." *Walker v. Mintzes,* 771 F.2d 920, 925 (6th Cir.1985) (citing *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

The court concludes that both defendants are entitled to entry of judgment in their favor. The plaintiff has failed to demonstrate that the sending state's federal defendant has violated any of his rights under federal law. To the extent the prosecutor has violated any provision of the law in obtaining the plaintiff's custody a second time, which this court specifically does not find, the receiving state defendant has provided the dismissal of charges and removal of the detainer which the plaintiff sought as injunctive relief, and he is entitled to absolute immunity for his actions with regard to the damages claim.

 As to the plaintiff's request to amend his complaint, the court may deny such a motion where the complaint, as amended, could not withstand a motion to dismiss. *Neighborhood Development Corp. v. Advisory Council on Historic Preservation,* 632 F.2d 21, 23 (6th Cir. 1980); *LRL Properties v. Portage Metro Housing Authority,* 55 F.3d 1097 (6th Cir. 1995). In the instant case, the court finds that none of the plaintiff's amendments would withstand a motion to dismiss. The court has addressed his purported new claims and decided them against him herein. As to the newly-named defendants, another Indiana prosecutor, Rosenberry, would, like his colleague, be entitled to absolute immunity; the federal IAD administrator, Willis, and the state IAD administrator are not alleged to have violated the instant plaintiff's rights, except in their roles as supervisors, and liability cannot be had on a *respondeat superior* theory. *See Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir.1984), *cert. denied,* 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984); *Polk County v. Dodson,* 454 U.S. 312, 325–26, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981).

### CONCLUSION

For the foregoing reasons, and the court being advised, IT IS HEREBY ORDERED as follows:

(1) Defendant Smith's motion for summary judgment [Record No. 10] is GRANTED.

(2) Defendant Sawyer–Hawk's motion for summary judgment [Record No. 15] is GRANTED.

(3) Plaintiff Tungate's motion for leave to amend his complaint [Record No. 20] is DENIED.

(4) Plaintiff Tungate's motion for discovery [Record No. 19] is DENIED as moot.

(5) This action is DISMISSED and Judgment shall be entered contemporaneously with this Memorandum Opinion in favor of the defendants.

### JUDGMENT

In accordance with the Memorandum Opinion and Order entered contemporane-

ously with this Judgment, the court hereby ORDERS AND ADJUDGES:

(1) Judgment IS ENTERED in favor of Kathleen Hawk–Sawyer and William O. Smith;

(2) this matter IS DISMISSED WITH PREJUDICE;

(3) this Judgment IS FINAL and appealable, and no just cause for delay exists;

(4) the Court CERTIFIES that an appeal may be taken in good faith; and

(5) this matter IS STRICKEN from the active docket.